**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

NEW YORK STATE RIFLE AND PISTOL
ASSOCIATION, INC. and ROBERT NASH,

*Plaintiffs*,

v.

GEORGE P. BEACH II, in his official capacity as
Superintendent of the New York State Police and
RICHARD J. MCNALLY, in his official capacity
as Justice of the New York State Supreme Court,
Third Judicial District, and Licensing Officer for
Rensselaer County,

*Defendants*.

Civil Action No.
1:18-CV-0134 (BKS/ATB)

---

**MEMORANDUM OF EVERYTOWN FOR GUN SAFETY**
**AS AMICUS CURIAE IN SUPPORT OF DEFENDANTS**

Ilann M. Maazel
O. Andrew F. Wilson
EMERY CELLI BRINCKERHOFF &
ABADY LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000
*imaazel@ecbalaw.com*

Eric Tirschwell
Mark Anthony Frassetto
EVERYTOWN FOR GUN SAFETY
SUPPORT FUND
132 E. 43rd Street, # 657
New York, NY 10017

April 2, 2018

*Counsel for Amicus Curiae*
*Everytown for Gun Safety*

**CORPORATE DISCLOSURE STATEMENT**

Everytown for Gun Safety has no parent corporations. It has no stock and hence no publicly held company owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................... i

TABLE OF CONTENTS.................................................................................................II

TABLE OF AUTHORITIES ....................................................................................... III

INTEREST OF AMICUS CURIAE ............................................................................ 1

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 3

       A.    "Longstanding" laws are deemed constitutional under *Heller* because they are consistent with our "historical tradition." ................................. 4

       B.    New York's public-carry regime is a "longstanding" and constitutional regulation under *Heller*.................................................................................. 5

           1. English History ...................................................................................... 5

           2. Founding-Era American History............................................................ 7

           3. Early-19th-Century American History.................................................. 11

           4. Mid-to-Late-19th-Century American History...................................... 17

CONCLUSION............................................................................................................ 20

CERTIFICATE OF SERVICE ................................................................................... 1

# TABLE OF AUTHORITIES

<u>Cases</u>

*Andrews v. State,*
    50 Tenn. 165 (1871)..................................................................................................16

*Avitabile v. Cuomo,*
    No. 16-cv-01447 (N.D.N.Y.)......................................................................................1

*Chune v. Piott,*
    80 Eng. Rep. 1161 (K.B. 1615) ...................................................................................8

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)..........................................................................................passim

*Edwards v. Aguillard,*
    482 U.S. 578 (1987)..................................................................................................14

*English v. State,*
    35 Tex. 473 (1871)............................................................................................15, 16

*Flanagan v. Becerra,*
    No. 16-cv-06164 (C.D. Cal.) ......................................................................................1

*Fyock v. Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) ......................................................................................4

*Kachalsky v. County of Westchester,*
    701 F.3d 81 (2d Cir. 2012) ................................................................................passim

*King v. Hutchinson,*
    168 Eng. Rep. 273 (1784).............................................................................................9

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)..................................................................................................14

*Miller v. Texas,*
    153 U.S. 535 (1894)..................................................................................................16

*N.Y. State Rifle & Pistol Ass'n v. City of New York,*
    883 F.3d 45 (2d Cir. 2018) ....................................................................................2, 4

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
    804 F.3d 242 (2d Cir. 2015) ......................................................................................4

*NRA v. BATF*,
  700 F.3d 185 (5th Cir. 2012) ...................................................................5

*Nunn v. State*,
  1 Ga. 243 (1846) .......................................................................................17

*Payton v. New York*,
  445 U.S. 573 (1980)...................................................................................8

*Peruta v. California*,
  137 S. Ct. 1995 (2017)...............................................................................5

*Peruta v. County. of San Diego*,
  824 F.3d 919 (9th Cir. 2016) (en banc) ....................................................5

*Peruta v. County of San Diego*,
  No. 10–56971 (9th Cir.).............................................................................1

*State v. Barnett*,
  34 W. Va. 74 (1890)............................................................................16, 18

*State v. Duke*,
  42 Tex. 455 (1874).....................................................................................15

*State v. Smith*,
  11 La. Ann. 633 (1856).............................................................................17

*State v. Workman*,
  35 W. Va. 367 (1891).................................................................................16

*United States v. Marzzarella*,
  614 F.3d 85 (3d Cir. 2010) ........................................................................4

*United States v. Skoien*,
  614 F.3d 638 (7th Cir. 2010) (en banc) ....................................................5

*Wrenn v. District of Columbia*,
  864 F.3d 650 (D.C. Cir. 2017)..................................................................13

*Wrenn v. District of Columbia*,
  No. 16–7025 (D.C. Cir.) ..................................................................1, 16, 17

## American Statutes

1686 N.J. Laws 289, ch. 9 ..............................................................................8

1694 Mass. Laws 12, no. 6. .............................................................................9

1699 N.H. Laws 1 .................................................................................................... 10

1786 Va. Laws 33, ch. 21 .................................................................................... 10, 15

1792 N.C. Laws 60, ch. 3 ...................................................................................... 10

1795 Mass. Laws 436, ch. 2 .................................................................................. 10

1801 Tenn. Laws 710, § 6 ..................................................................................... 10

1821 Me. Laws 285, ch. 76, § 1 ............................................................................ 10

1838 Wisc. Laws 381, § 16 .................................................................................... 12

1841 Me. Laws 709, ch. 169, § 16 ........................................................................ 12

1846 Mich. Laws 690, § 16 ................................................................................... 12

1847 Va. Laws 127, 129, ch. 14, § 16 ................................................................... 12

1847 Va. Laws at 129, § 16 .............................................................................. 12, 13

1851 Minn. Laws at 527–28, §§ 2, 17, 18 ........................................................... 12

1852 Del. Laws 330, ch. 97, § 13 ......................................................................... 10

1853 Or. Laws 218, ch. 16, § 17 ........................................................................... 12

1854 Ala. Laws 588, § 3272 .................................................................................. 13

1859 N.M. Laws 94, § 2 ....................................................................................... 17

1861 Ga. Laws 859, § 4413 ................................................................................... 13

1861 Pa. Laws 248, § 6 ......................................................................................... 12

1869 N.M. Laws 312, § 1 ..................................................................................... 19

1870 S.C. Laws 403, no. 288, § 4 ......................................................................... 15

1870 W. Va. Laws 702, 703, ch. 153, § 8 ......................................................... 15, 18

1871 Tex. Laws 1322, art. 6512 ....................................................................... 15, 18

1873 Minn. Laws. 1025, § 17 ............................................................................... 13

1875 Wyo. Laws 352, § 1 ..................................................................................... 19

1889 Ariz. Laws 16, § 1 ....................................................................................... 19

v

1889 Idaho Laws 23, § 1 .................................................................................................. 19

1890 Okla. Laws 495, art. 47, §§ 2, 5 ............................................................................. 19

1891 W. Va. Laws 915, ch. 148, § 7 ............................................................................... 18

1901 Mich. Laws 687, § 8 ................................................................................................ 20

1903 Okla. Laws 643, ch. 25, art. 45, § 584 ................................................................... 19

1909 Ala. Laws 258, no. 215, §§ 2, 4 .............................................................................. 18

1909 Tex. Laws 105 ......................................................................................................... 20

1913 Haw. Laws 25, act 22, § 1 ....................................................................................... 18

1913 N.Y. Laws 1627 ....................................................................................................... 18

1925 W. Va. Laws 25 ........................................................................................................ 19

Mass. Gen. Laws ch. 275, § 4 .......................................................................................... 11

New York Penal Law § 400.00(2)(f) ................................................................................ 1

<u>American Municipal Ordinances</u>

Checotah, Okla., Ordinance no. 11 (1890) ....................................................................... 20

Dallas, Tex., Ordinance (1887) ........................................................................................ 20

La Crosse, Wis., Ordinance no. 14, § 15 (1880) .............................................................. 20

Los Angeles, Cal., Ordinance nos. 35–36 (1878) ............................................................ 20

Nebraska City, Neb., Ordinance no. 7 (1872) .................................................................. 20

New Haven, Conn., Ordinances § 192 (1890) .................................................................. 20

Rawlins, Wyo., Ordinances art. 7 (1893) ......................................................................... 20

Salina, Kan., Ordinance no. 268 (1879) ........................................................................... 20

San Antonio, Tex., Ordinance ch. 10 (1899) ................................................................... 20

Syracuse, N.Y., Ordinances ch. 27 (1885) ...................................................................... 20

Washington, D.C., Ordinance ch. 5 (1857) ...................................................................... 20

Wichita, Kan., Ordinance no. 1641 (1899) ...................................................................... 20

English Statutes and Royal Proclamations

20 Ric. 2, 93, ch. 1 (1396) ........................................................................... 6

25 Edw. 3, 320, ch. 2, § 13 (1351). ........................................................... 6

7 Ric. 2, 35, ch. 13 (1383) .......................................................................... 6

English Bill of Rights of 1689, 1 W. & M. st. 2. ch. 2 .............................. 7

Statute of Northampton, 2 Edw. 3, 258, ch. 3 (1328) ............................... 5

Books and Articles

A Bill for the Office of Coroner and Constable (Mar. 1, 1682), reprinted in *Grants, Concessions & Original Constitutions* 251 .............................................. 10

Bishop, *Commentaries on the Law of Statutory Crimes(1873)* .............. 9, 11

Blocher,
*Firearm Localism*, 123 Yale L.J. 82 (2013) ............................................ 20

Bond,
*A Compleat Guide for Justices of the Peace* 181 (1707). ......................... 9

Charles,
*The Faces of the Second Amendment Outside the Home*,
60 Clev. St. L. Rev. 1, (2012) ........................................................ 6, 9, 10

Charles,
*The Statute of Northampton by the Late Eighteenth Century*,
41 Fordham Urb. L.J. City Square 10 (2013) ......................................... 8

City Intelligence, Boston Courier (Boston, Mass.), Mar. 7, 1853 .............. 13

City Items, Richmond Whig (Richmond, Va.), Sept. 25, 1860 .................. 13

Cornell,
*The Right to Carry Firearms Outside of the Home*,
39 Fordham Urb. L.J. 1695 (2012) ......................................................... 12

Cramer,
*Concealed Weapon Laws of the Early Republic* (1999) ...................... 13, 14

Dunlap,
*The New York Justice* 8 (1815) .............................................................. 10

Elliot Shepard,
    *Ordinances of the City of New York* 214 (1881) ..................................................... 19

Ewing,
    *A Treatise on the Office & Duty of a Justice of the Peace* (1805) ............................ 11

Hammond,
    *A Practical Treatise; Or an Abridgement of the Law Appertaining to the Office of*
    *Justice of the Peace* (1841) ....................................................................................... 12

Hawkins,
    *Treatise of the Pleas of the Crown* 665 ....................................................................... 9

Haywood,
    *A Manual of the Laws of North-Carolina* (1814) .................................................... 10

Haywood,
    *The Duty and Authority of Justices of the Peace, in the State of Tennessee* (1810) ............... 11

Haywood,
    *The Duty and Office of Justices of the Peace, and of Sheriffs, Coronoers,*
    *Constables* (1800) ...................................................................................................... 11

Keble,
    *An Assistance to the Justices of the Peace, for the Easier Performance of Their*
    *Duty* 224 (1683) ........................................................................................................... 7

Meltzer,
    *Open Carry for All*, 123 Yale L.J. 1486 (2014) ......................................................... 9

Niles,
    *The Connecticut Civil Officer* (1823) ...................................................................... 10

Recorders Court, Oregonian (Portland, Or.), Aug. 6, 1867 ............................................ 13

Russell,
    *Treatise on Crimes & Misdemeanors* 124 .................................................................. 9

*Vermont Telegraph*, Feb. 7, 1838 ................................................................................. 10

Wharton,
    *A Treatise on the Criminal Law of the United States* (1846) .................................... 11

*When and Where May a Man Go Armed*, S.F. Bulletin, Oct. 26, 1866 ......................... 20

Winkler, *Gunfight* 165 (2011) ...................................................................................... 20

<u>Constitutional Provisions</u>

Md. Const. of 1776, art. III, § 1.........................................................................................10

## INTEREST OF AMICUS CURIAE

Everytown for Gun Safety ("Everytown") is the largest gun-violence-prevention organization in the country. It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed in the wake of the murder of twenty children and six adults in an elementary school in Newtown, Connecticut.  Everytown's mission includes defending gun laws through the filing of amicus briefs and memoranda providing historical context, social science and public policy research, and doctrinal analysis that might otherwise be overlooked.

Everytown has drawn on its substantial research on historical firearms laws to file briefs and memoranda in several recent Second Amendment cases, including cases involving public-carry licensing regimes. *See Wrenn v. District of Columbia*, No. 16–7025 (D.C. Cir.); *Peruta v. County of San Diego,* No. 10–56971 (9th Cir.); *Flanagan v. Becerra,* No. 16-cv-06164 (C.D. Cal.).[1] As in those cases, Everytown seeks to assist this Court by providing relevant historical materials.[2]

## INTRODUCTION

The present motion to dismiss does not present a difficult question for the Court. Plaintiffs' challenge here is precluded by the Second Circuit's decision in *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012), which upheld the "proper cause" licensing requirement in New York Penal Law § 400.00(2)(f) against an identical Second Amendment challenge. *See*

---

[1]     Everytown also has recently filed an amicus memorandum in a Second Amendment case in this district. *See Avitabile v. Cuomo*, No. 16-cv-01447 (N.D.N.Y.).

[2]     An appendix of historical gun laws accompanies this memorandum. In addition, all parties consent to the filing of this memorandum, and no counsel for any party authored it in whole or part. Apart from amicus curiae, no person contributed money to fund this memorandum.

Complaint (Dkt. No. 1) ¶ 6 ("Plaintiffs acknowledge that the result they seek is contrary to *Kachalsky v. County of Westchester . . . .*"). This binding precedent standing alone obligates the court to grant the State's motion. *See N.Y. State Rifle & Pistol Ass'n v. City of New York*, 883 F.3d 45, 56 n.5 (2d Cir. 2018) (reaffirming the holding in *Kachalsky*, "by which th[e] panel [wa]s, in any event, bound").

While *Kachalsky* directs the ultimate result of the State's motion to dismiss, Everytown files this memorandum to provide the court with additional historical analysis supporting the State's motion. Since the Second Circuit's decision in *Kachalsky*, in which the court found the history presented was "highly ambiguous," and "d[id] not directly address the specific question before [the Court]," 701 F.3d at 91, historians and legal scholars have produced a substantial amount of historical research which reinforces the constitutionality of New York's law.[3] This history shows that laws like New York's, rather than representing regulatory outliers, are consistent with a historical tradition of regulating the carrying of firearms and other weapons in public going back centuries. This memorandum provides an account of that tradition. In so doing, it provides significant additional support for the result already reached by the Second Circuit, and, we submit, should assist this Court in issuing an opinion consistent with *Kachalsky*, dismissing Plaintiffs' challenge here.

For centuries, English law broadly prohibited anyone from carrying a dangerous weapon in public, beginning with the Statute of Northampton in 1328, and continuing after the English Bill of Rights of 1689. This tradition took hold in America in the 17th and 18th centuries when

---

[3]     The State has already addressed the new and extremely compelling social science research showing laws like New York's result in a significant reduction in gun homicide, gun assaults and violent crime. Mem. of Law in Support of Defendants' Motion to Dismiss (Dkt. No. 19-1) at 7-9.

several colonies enacted similar restrictions. It continued in the 19th century, when many states and municipalities broadly prohibited public carry in cities, towns, and villages, while many others did what New York does today: allow public carry by those with "proper cause." Although a more permissive approach to public carry began emerging in the South around that time, these antebellum Southern laws were motivated largely by the ever-present fear of slave rebellions, and they did not represent a majority approach. Altogether, by the end of the 19th century, nearly 20 states and many cities had enacted laws that either entirely prohibited public carry in urban areas or required "good reason" to publicly carry a firearm.

New York's law carries forward this longstanding tradition. It is clearly constitutional under *District of Columbia v. Heller*, 554 U.S. 570 (2008). Such a robust historical pedigree is not necessary to satisfy the Second Amendment, but it is sufficient to do so. Whatever the Amendment's precise contours, there can be no doubt that a law that has its roots in 14th-century England, and is *more* permissive of public carry than dozens of American laws that existed from the founding era through the 19th century, is consistent with our "historical tradition," *id.* at 627, and thus constitutional.

## ARGUMENT

The question in this case is not whether the Second Amendment—which the Supreme Court held in *Heller* protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *id.* at 635—has any application outside the home. Rather, the question is whether New York's public-carry regime is consistent with the Amendment's protections (as applied to the states by the 14th Amendment).

To answer that question, the Second Circuit, like other courts, has established a "two-step inquiry," first asking whether the challenged law burdens conduct within the scope of the

Second Amendment right and then, if it does, "determin[ing] and apply[ing] the appropriate level of scrutiny." *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 254 (2d Cir. 2015) (citing cases); *accord N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 883 F.3d at 55. Although, as the Second Circuit held in *Kachalsky*, and reaffirmed in *New York State Rifle & Pistol Association v. City of New York*, New York's public-carry regime satisfies the appropriate level of intermediate scrutiny, this memorandum shows that the analysis need not get that far: this law survives at step one, which provides a sufficient and additional ground to uphold it.

A.    **"Longstanding" laws are deemed constitutional under *Heller* because they are consistent with our "historical tradition."**

One way to determine whether a law burdens the Second Amendment right is to assess the law based on a "historical understanding of the scope of the right," *Heller*, 554 U.S. at 625, and consider whether the law is within "the history and tradition of firearm regulation" that was left intact by the Second Amendment and by *Heller*. *Kachalsky*, 701 F.3d at 101. *Heller* identified several "examples" of such regulations, including "prohibitions on the possession of firearms by felons and the mentally ill" and "laws imposing conditions and qualifications on the commercial sale of arms," which are "presum[ed]" not to violate the Second Amendment right because of their historical acceptance as consistent with its protections. 554 U.S. at 626-27 & n.26. Such "longstanding" laws, the Supreme Court explained, are treated as tradition-based "exceptions" by virtue of their "historical justifications." *Id.* at 626, 635; *see Fyock v. Sunnyvale*, 779 F.3d 991, 996-7 (9th Cir. 2015) ("longstanding prohibitions" are "traditionally understood to be outside the scope of the Second Amendment"); *United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("longstanding limitations are exceptions to the right to bear arms").

While neither the Supreme Court, nor the Second Circuit (or any circuit) has established a precise standard for what is required for a law to be found longstanding, most courts to

4

consider the issue have found it does not require that a law "mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc). To the contrary, laws may qualify as longstanding even if they "cannot boast a precise founding-era analogue," *NRA v. BATF*, 700 F.3d 185, 196 (5th Cir. 2012)—as was the case with the "early twentieth century regulations" prohibiting firearm possession by felons and the mentally ill and regulating the commercial sale of arms deemed longstanding in *Heller*, *see Kachalsky*, 701 F.3d at 90 n.11. But New York's law is no 20th-century creation; it embodies a tradition of regulation stretching back seven centuries, with antecedents in the founding era.  This centuries-long pedigree in Anglo-American history clearly makes New York's law "longstanding" and constitutional under *Heller*.

**B.     New York's public-carry regime is a "longstanding" and constitutional regulation under *Heller*.**

The tradition of restricting the public carrying of firearms that underpins New York's public carry law traces its origins to the fourteenth century in England through this country's founding era and up to today.

### 1.     English History

**Beginning in 1328, England broadly restricts public carry in populated areas.**
Because "the Second Amendment" protects a "right inherited from our English ancestors," *Peruta v. County of San Diego*, 824 F.3d 919, 927 (9th Cir. 2016) (en banc), *cert. denied sub nom. Peruta v. California*, 137 S. Ct. 1995 (2017), we start with the English history. This history stretches back to at least 1328, when England enacted the Statute of Northampton, providing that "no Man great nor small" shall "go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere." 2 Edw. 3, 258, ch. 3 (1328). After this statute was enacted, King Edward III and his successors directed sheriffs and

bailiffs to arrest "all those whom [they] shall find going armed." Charles, *The Faces of the Second Amendment Outside the Home*, 60 Clev. St. L. Rev. 1, 13–25 (2012).

Over the ensuing decades, England repeatedly reenacted the Statute of Northampton's public-carry restriction. *See, e.g.*, 7 Ric. 2, 35, ch. 13 (1383); 20 Ric. 2, 93, ch. 1 (1396). Because this restriction carried misdemeanor penalties, violators were usually required to forfeit their weapons and pay a fine. *Id.* A separate law went further, outlawing "rid[ing] armed covertly or secretly with Men of Arms against any other." 25 Edw. 3, 320, ch. 2, § 13 (1351). This law had heavier penalties, *id.*, because it regulated threatening behavior rather than simply carrying weapons in public—the conduct prohibited by the Statute of Northampton.

By the 16th century, firearms had become increasingly accessible in England, and the possibility that they would be carried in public had become increasingly threatening to public safety. To guard against this threat, Queen Elizabeth I in 1579 called for strict enforcement of the Statute of Northampton's prohibition on carrying "Daggers, Pistols, and such like, not only in Cities and Towns, [but] in all parts of the Realm in common high[ways], whereby her Majesty's good quiet people, desirous to live in [a] peaceable manner, are in fear and danger of their lives." Charles, *Faces*, 60 Clev. St. L. Rev. at 21 (spelling modernized). The carrying of "such offensive weapons" (like "Handguns"), she elaborated, and "the frequent shooting [of] them in and near Cities, Towns corporate, [and] the Suburbs thereof where [the] great multitude of people do live, reside, and trav[el]," had caused "great danger" and "many harms [to] ensue." *Id.* at 22 (spelling modernized). Fifteen years later, she reaffirmed that publicly carrying pistols—whether "secretly" or in the "open"—was "to the terrour of all people professing to travel and live peaceably." *Id.*

To carry out the Statute of Northampton's prohibition, British constables, magistrates, and justices of the peace were instructed to "Arrest all such persons as they shall find to carry

Daggers or Pistols" publicly. Keble, *An Assistance to the Justices of the Peace, for the Easier Performance of Their Duty* 224 (1683). This mandate was unmistakably broad: "[I]f any person whatsoever . . . shall be so bold as to go or ride Armed, by night or by day, in Fairs, Markets, or any other places . . . then any Constable . . . may take such Armor from him for the Kings use, and may also commit him to the Gaol." *Id.*

The Statute of Northampton's public-carry restriction remains fully in effect following the English Bill of Rights of 1689. In the late 17th century, William and Mary enshrined the right to have arms in the Declaration of Rights, later codified in the English Bill of Rights in 1689. This right—which "has long been understood to be the predecessor to our Second Amendment," *Heller*, 554 U.S. at 593—ensured that subjects "may have arms for their defence suitable to their conditions, and as allowed by law." 1 W. & M. st. 2. ch. 2. As Blackstone later wrote, this right was considered "a public allowance, under due restrictions[,] of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." 1 Blackstone, *Commentaries on the Laws of England* 144 (1769). One such "due restriction" was the Statute of Northampton, which remained in effect after the right to bear arms was codified in 1689. *See* 4 Blackstone, *Commentaries* 148–49; Gardiner, *The Compleat Constable* 18 (1692); *Middlesex Sessions* (reporting 1751 conviction under law).

## 2. Founding-Era American History

The legal authorities most influential to the founding generation understood the Statute of Northampton to restrict public carry in populated areas. The general understanding of the Statute of Northampton as broadly prohibiting public carry in populated places existed in England throughout the 17th and 18th centuries and was adopted by the legal authorities whose views were most influential to the Framers. *See* Charles, *The Statute of*

7

*Northampton by the Late Eighteenth Century*, 41 Fordham Urb. L.J. City Square 10 (2013). In 1644, for example, Lord Coke—"widely recognized by the American colonists as the greatest authority of his time on the laws of England," *Payton v. New York*, 445 U.S. 573, 593–94 (1980) (internal quotation marks omitted)—described the Statute of Northampton as making it unlawful "to goe nor ride armed by night nor by day . . . in any place whatsoever." Coke, *The Third Part of the Institutes of the Laws of England* 160 (1817 reprint).

One century later, Blackstone—"the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593–94—described the statute similarly: "The offence of riding or going armed with dangerous or unusual weapons is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton." 4 Blackstone, *Commentaries* 148–49. In other words, because carrying a dangerous weapon (such as a firearm) in populated public places naturally terrified the people (particularly if done openly), it was a crime against the peace—even if unaccompanied by a threat, violence, or any additional breach of the peace. *See Chune v. Piott*, 80 Eng. Rep. 1161, 1162 (K.B. 1615) ("Without all question, the sheriffe hath power to commit . . . if contrary to the Statute of Northampton, he sees any one to carry weapons in the high-way, in terrorem populi Regis; he ought to take him, and arrest him, notwithstanding he doth not break the peace.").

**The colonies begin adopting England's tradition of public-carry regulation.** Around the time that the English Bill of Rights was adopted, America began its own tradition of regulating public-carry. The first step was a 1686 New Jersey law that sought to prevent the "great fear and quarrels" induced by "several persons wearing swords, daggers, pistols," and "other unusual or unlawful weapons." 1686 N.J. Laws 289, 289–90, ch. 9. To combat this "great abuse," the law provided that no person "shall presume privately to wear any pocket pistol" or

"other unusual or unlawful weapons," and "no planter shall ride or go armed with sword, pistol, or dagger," except for "strangers[] travelling" through. *Id.* This was only the start of a long history of regulation "limiting gun use for public safety reasons"—especially public carry in populated areas. Meltzer, *Open Carry for All*, 123 Yale L.J. 1486, 1523 (2014). As against this history, "there are no examples from the Founding era of anyone espousing the concept of a general right to carry." *Id.*

**Many states enact laws mirroring the Statute of Northampton both before and after the Constitution's adoption.** Eight years after New Jersey's law, Massachusetts enacted its own version of the Statute of Northampton, authorizing justices of the peace to arrest anyone who "shall ride or go armed Offensively before any of Their Majesties Justices, or other [of] Their Officers or Ministers doing their Office, or elsewhere." 1694 Mass. Laws 12, no. 6.

By using the word "offensively," Massachusetts ensured that this prohibition applied only to "offensive weapons," as it had in England—not *all* arms. Constable oaths of the 18th century described this law with similar language. *See* Charles, *Faces*, 60 Clev. St. L. Rev. at 34 n.178. One treatise, for example, explained that "[a] person going or riding with offensive Arms may be arrested." Bond, *A Compleat Guide for Justices of the Peace* 181 (1707). Thus, under the law, a person could publicly carry a hatchet or horsewhip, but not a pistol. *See* Hawkins, *Treatise of the Pleas of the Crown* 665 (explaining that hatchets and horsewhips were not "offensive weapons," while "guns, pistols, daggers, and instruments of war" were); *King v. Hutchinson*, 168 Eng. Rep. 273, 274 (1784) (explaining that firearms are offensive weapons).[4]

---

[4]     American treatises said the same. *See* Bishop, *Commentaries on the Law of Statutory Crimes* 214 (1873); Russell, *Treatise on Crimes & Misdemeanors* 124

One century later, Massachusetts reenacted its law, this time as a state. 1795 Mass. Laws 436, ch. 2. Because the law had been in effect for so long, it was "well known to be an offence against law to ride or go with . . . firelocks, or other dangerous weapons," as one newspaper later reported, so it "[could not] be doubted that the vigilant police officers" would arrest violators. Charles, *Faces*, 60 Clev. St. L. Rev. at 33 n.176 (quoting *The Salem Gazette*, June 2, 1818, at 4).

Following Massachusetts' lead, additional states enacted similar laws, including founding-era statutes in Virginia and North Carolina, a New Hampshire law passed five years after Massachusetts' first enactment, and later enactments in states ranging from Maine to Tennessee. *See* 1699 N.H. Laws 1; 1786 Va. Laws 33, ch. 21; 1792 N.C. Laws 60, 61, ch. 3; 1801 Tenn. Laws 710, § 6; 1821 Me. Laws 285, ch. 76, § 1; 1852 Del. Laws 330, 333, ch. 97, § 13. Other states, such as New York, incorporated the Statute of Northampton through their common law. *See* Dunlap, *The New York Justice* 8 (1815) (prohibiting "a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people").[5]

To ensure that these laws were enforced, the constables, magistrates, and justices of the peace in these jurisdictions were required to "arrest all such persons as in your sight shall ride or go armed." Haywood, *A Manual of the Laws of North-Carolina* pt. 2 at 40 (1814) (N.C. constable oath). That was because, as constables were informed, "riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people

---

[5]     *See* A Bill for the Office of Coroner and Constable (Mar. 1, 1682), reprinted in *Grants, Concessions & Original Constitutions* 251 (N.J. constable oath) ("I will endeavour to arrest all such persons, as in my presence, shall ride or go arm'd offensively."); Niles, *The Connecticut Civil Officer* 154 (1823) (noting crime of "go[ing] armed offensively," even without threatening conduct); *Vermont Telegraph*, Feb. 7, 1838 (observing that "[t]he laws of New England" provided a self-defense right "to individuals, but *forb[ade] their going armed* for the purpose"). Northampton also applied in Maryland. Md. Const. of 1776, art. III, § 1.

of the land, and is prohibited by statute." Haywood, *The Duty and Office of Justices of the Peace, and of Sheriffs, Coroners, Constables* 10 (1800); *see also* Haywood, *The Duty and Authority of Justices of the Peace, in the State of Tennessee* 176 (1810).

As with the English statute, prosecution under these laws did not require a "threat[] [to] any person in particular" or "any particular act of violence." Ewing, *A Treatise on the Office & Duty of a Justice of the Peace* 546 (1805); *see also* Bishop, *Commentaries on the Law of Statutory Crimes* (noting that there was no requirement that "peace must actually be broken, to lay the foundation for a criminal proceeding"). Nor did these laws have a self-defense exception: No one could "excuse the wearing [of] such armor in public, by alleging that such a one threatened him." Wharton, *A Treatise on the Criminal Law of the United States* 527–28 (1846).

### 3. Early-19th-Century American History

**Many states enact a variant of the Statute of Northampton, allowing public carry with "reasonable cause to fear an assault."** In 1836, Massachusetts amended its public-carry prohibition to provide a narrow exception for those having "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property." 1836 Mass. Laws 748, 750, ch. 134, § 16. Absent such "reasonable cause," no person could "go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon." *Id.* Those who did so could be punished by being made to pay sureties for violating the statute, *id.*; if they did not do so, they could be imprisoned. *See id.* at 749.[6]

---

[6]    Sureties were a form of criminal punishment, like a bond. *See* Punishments, The Proceedings of the Old Bailey, London's Central Criminal Court, 1674 to 1913, http://bit.ly/1ED5tC2; 34 Edw. 3, 364, ch. 1 (1360). They continue to exist as a form of criminal punishment in some states, including Massachusetts. *See* Mass. Gen. Laws ch. 275, § 4. The criminal nature of the surety-based historical laws, moreover, is confirmed by the legislatures that enacted them. The Massachusetts legislature placed its restriction in Title II of the Code

Although the legislature chose to trigger these penalties using a citizen-complaint mechanism (allowing "any person having reasonable cause to fear an injury, or breach of the peace" to file a complaint, *id.* at 750, § 16), the law was understood to prohibit carrying a firearm in public without good cause. This was so even when the firearm was not used in any threatening or violent manner: The legislature placed the restriction in a section entitled "Persons who go armed may be required to find sureties for the peace," and expressly cited the state's previous criminal law enactment of the Statute of Northampton. *Id.* And elsewhere in the same statute the legislature separately punished "any person [who] threatened to commit an offence against the person or property of another." *Id.* at 749, § 2. Thus, as one judge explained in a grand jury charge appearing in the contemporary press in 1837, there was little doubt at the time that "no person may go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to apprehend an assault or violence to his person, family, or property." Cornell, *The Right to Carry Firearms Outside of the Home*, 39 Fordham Urb. L.J. 1695, 1720 & n.134 (2012); *see* Hammond, *A Practical Treatise; Or an Abridgement of the Law Appertaining to the Office of Justice of the Peace* 184–86 (1841).

Within a few decades, many states (all but one outside the slaveholding South) had adopted nearly identical laws.[7] Most copied the Massachusetts law verbatim—enforcing the public-carry prohibition through a citizen-complaint provision and permitting a narrow self-defense exception. *See, e.g.*, 1851 Minn. Laws at 527–28, §§ 2, 17, 18 (section entitled "Persons

entitled "Of Proceedings in Criminal Cases." 1836 Mass. Laws 748, 750, ch. 134, § 16. Others did likewise. *See* 1851 Minn. Laws at 527–28, §§ 2, 17, 18 ("Persons carrying offensive weapons, how punished."); 1846 Mich. Laws 690, ch. 162 § 16 ("Of Proceedings in Criminal Cases"); 1847 Va. Laws 127, ch. 14, § 16 (same).

[7]    *See, e.g.*, 1838 Wisc. Laws 381, § 16; 1841 Me. Laws 709, ch. 169, § 16; 1846 Mich. Laws 690, 692, ch. 162, § 16; 1847 Va. Laws 127, 129, ch. 14, § 16; 1851 Minn. Laws 526, 528, ch. 112, § 18; 1853 Or. Laws 218, 220, ch. 16, § 17; 1861 Pa. Laws 248, 250, § 6

carrying offensive weapons, how punished"); 1873 Minn. Laws. 1025, § 17 (same after 14th Amendment's ratification). At least one state (Virginia) used slightly different language. 1847 Va. Laws at 129, § 16 ("If any person shall go armed with any offensive or dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may be required to find sureties for keeping the peace."). Semantic differences aside, these laws were understood to do the same thing: broadly restrict public carry, while establishing a limited exception for those with a particular need for self-defense.[8]

**Taking a different approach, many Southern states elect to permit public carry, while regulating the manner of carry.** In contrast to the Northampton model and its good-cause variant, many—but not all—states in the slaveholding South were more permissive of public carry. They generally allowed white citizens to carry firearms in public so long as the weapons were not concealed. *See, e.g.*, 1854 Ala. Laws 588, § 3272; 1861 Ga. Laws 859, § 4413; *see generally* Cramer, *Concealed Weapon Laws of the Early Republic* (1999). It is this alternative (and minority) tradition on which a divided panel relied in *Wrenn v. District of Columbia*, 864 F.3d 650, 658 (D.C. Cir. 2017), the case now relied upon by the plaintiffs here. *See* Complaint ¶ 6.

This tradition owes itself to the South's peculiar history and the prominent institution of slavery. *See generally* Ruben & Cornell, *Firearm Regionalism and Public Carry: Placing*

---

[8]     Newspaper articles from the 19th century describe criminal prosecutions under these laws even when the person was carrying a concealed weapon—a form of public carry that, by itself, does not indicate menacing conduct beyond bare carry. *See, e.g.*, City Intelligence, Boston Courier (Boston, Mass.), Mar. 7, 1853, at 4 (reporting arrest and charge against person for "carrying a concealed weapon," a "loaded pistol"); City Items, Richmond Whig (Richmond, Va.), Sept. 25, 1860, at 3 (reporting that person was "arraigned" for "carrying a concealed weapon" and "required [to] give security"); Recorders Court, Oregonian (Portland, Or.), Aug. 6, 1867, at 4 (reporting conviction for "carrying a concealed weapon," resulting in two-day imprisonment).

*Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121 (Sept. 25, 2015, https://goo.gl/3pUZHB). It reflects "a time, place, and culture where slavery, honor, violence, and the public carrying of weapons were intertwined." *Id.* at 125. Frederick Law Olmsted, for example, "attributed the need to keep slaves in submission as the reason that 'every white stripling in the South may carry a dirk-knife in his pocket, and play with a revolver before he has learned to swim.'" *Id.* at 21 (internal quotation marks omitted); *cf. McDonald v. City of Chicago*, 561 U.S. 742, 844 (2010) (Thomas, J., concurring) ("[I]t is difficult to overstate the extent to which fear of a slave uprising gripped slaveholders and dictated the acts of Southern legislatures."). And historians agree that "the South was substantially more violent than the North." Cramer, *Concealed Weapon Laws* 18. This view was shared by Massachusetts Senator Charles Sumner, whose "Bleeding Kansas" speech was cited at length in *Heller*, at 609, who addressed the disparate weapon cultures of the North and South.

> In those portions of our country where it is supposed essential to personal safety to go armed with pistols and bowie-knives mortal affrays are so frequent as to excite but little attention, and secure, with exceedingly rare exceptions, perfect impunity to the murderer; whereas at the North and East, where we are unprovided with such facilities for taking life, comparatively few murders of the kind are perpetrated. Charles Sumner," "*The Grandeur of Nations*" July 4, 1845 (quoting Judge William Jay, "*Address Before the American Peace Society*" (Boston, 1845)).

Even within the South, however, courts and legislatures took varying stances toward public carry. Virginia, for instance, "home of many of the Founding Fathers," *Edwards v. Aguillard*, 482 U.S. 578, 605 (1987) (Powell, J., concurring), prohibited public carry (with an exception for good cause) before ratification of the Fourteenth Amendment, after enacting a Northampton-style prohibition at the founding. 1847 Va. Laws at 129, § 16 (making it illegal to "go armed with any offensive or dangerous weapon, without reasonable cause to fear an assault

14

or other injury, or violence to his person, or to his family or property"); 1786 Va. Laws 33, ch. 21. South Carolina enacted a Northampton-style law during Reconstruction. 1870 S.C. Laws 403, no. 288, § 4. Around the same time, Texas prohibited public carry with an exception for good cause—a prohibition enforced with possible jail time, and accompanied by narrow exceptions that confirmed the law's breadth. 1871 Tex. Laws 1322, art. 6512 (prohibiting public carry absent an "immediate and pressing" self-defense need, while exempting one's "own premises" and "place of business, and travelers "carrying arms with their baggage"). And West Virginia, added to the Union during the Civil War, similarly allowed public carry only upon a showing of good cause. 1870 W. Va. Laws 702, 703, ch. 153, § 8.

Southern case law, too, reveals a lack of uniformity. Although a few pre-Civil War decisions interpreted state constitutions in a way that can be read to support a right to carry openly, even in populated public places without good cause, several post-War cases held the opposite. The Texas Supreme Court, for instance, twice upheld that state's good-cause requirement. *English v. State*, 35 Tex. 473 (1871); *State v. Duke*, 42 Tex. 455 (1874).  The court remarked that the law—which prohibited carrying "any pistol" in public without good cause, 1871 Tex. Laws 1322, art. 6512—"is nothing more than a legitimate and highly proper regulation" that "undertakes to regulate the place where, and the circumstances under which, a pistol may be carried; and in doing so, it appears to have respected the right to carry a pistol openly when needed for self-defense or in the public service, and the right to have one at the home or place of business," *Duke*, 42 Tex. at 459. The court explained that the law thus made "all necessary exceptions," and noted that it would be "little short of ridiculous" for a citizen to "claim the right to carry" a pistol in "place[s] where ladies and gentlemen are congregated together." *English*, 35 Tex. at 477–79. Further, the court observed, the good-cause requirement

was "not peculiar to our own state," for nearly "every one of the states of this Union ha[d] a similar law upon their statute books," and many had laws that were "more rigorous than the act under consideration." *Id.* at 479.

When the U.S. Supreme Court considered Texas's law in 1894, it took a similar view. After noting that the law "forbid[s] the carrying of weapons" absent good cause and "authoriz[es] the arrest, without warrant, of any person violating [it]," the Court determined that a person arrested under the law is not "denied the benefit" of the right to bear arms. *Miller v. Texas*, 153 U.S. 535, 538 (1894). Other courts upheld similar good-cause laws against constitutional attacks. *See, e.g.*, *State v. Workman*, 35 W. Va. 367, 367 (1891) (upholding West Virginia's good-cause requirement after previously interpreting it, in *State v. Barnett*, 34 W. Va. 74 (1890), to require specific, credible evidence of an actual threat of violence, not an "idle threat"). And even when a law wasn't directly challenged as unconstitutional, like in Virginia, courts "administered the law, and consequently, by implication at least, affirmed its constitutionality." *Workman*, 35 W. Va. At 367 (referring to Virginia and West Virginia courts).

By contrast, there is no historical case (Southern or otherwise) striking down a good-cause requirement as unconstitutional.[9] To be sure, a couple of cases, in the course of upholding

---

[9]     Even *Andrews v. State*, 50 Tenn. 165 (1871), cited in *Wrenn*, does not go so far. There, the court invalidated what "in effect [was] an absolute prohibition" on carrying a weapon "for any and all purposes," whether "publicly or privately, without regard to time or place, or circumstances." *Id.* at 187. "Under this statute," the court explained, "if a man should carry such a weapon about his own home, or on his own premises, or should take it from his home to a gunsmith to be repaired, or return with it, should take it from his room into the street to shoot a rabid dog that threatened his child, he would be subjected to the severe penalties of fine and imprisonment prescribed in the statute." *Id.* In striking down that prohibition, the court did not cast doubt on the constitutionality of a law like the one at issue here, which does not prohibit carrying a firearm in all places, but requires only a showing of good cause to carry a handgun *publicly*, in populated areas other than one's place of business. If anything, the court did the opposite: It reaffirmed that the legislature may "regulate the carrying of this weapon publicly."

concealed-carry prohibitions, expressed the view that the right to bear arms protects the right, under some circumstances, to openly carry a weapon in public. *See Nunn v. State*, 1 Ga. 243 (1846) (striking down the open-carry portion of a statewide prohibition on openly carrying weapons based on the erroneous view that the Second Amendment applied to the states before 1868). But even within the South, open carry was rare: The Louisiana Supreme Court, for example, referred to "the extremely unusual case of the carrying of such weapon in full open view." *State v. Smith*, 11 La. Ann. 633, 634 (1856). And New York's law, of course, does not go nearly as far as the one struck down in *Nunn*, which prohibited *any* form of public carry, and banned most handguns. At any rate, isolated snippets from a few state-court decisions issued decades after the Framing cannot trump the considered judgments of countless courts and legislatures throughout our nation's history.

### 4.  Mid-to-Late-19th-Century American History

**States continue to restrict public carry both before and after the 14th Amendment's ratification.** As America entered the second half of the 19th century, additional jurisdictions began enacting laws broadly restricting public carry, often subject to limited self-defense exceptions. Before the Civil War, New Mexico passed *An Act Prohibiting The Carrying Of Weapons, Concealed Or Otherwise*, making it unlawful for "any person [to] carry about his person, either concealed or otherwise, any deadly weapon," and requiring repeat offenders to serve a jail term "of not less than three months." 1859 N.M. Laws 94, § 2.

---

*Id.* at 187–88. And although the court suggested that, under Tennessee law, the right to bear arms might protect public carry "where it was clearly shown that [the arms] were worn *bona fide* to ward off or meet imminent and threatened danger to life or limb, or great bodily harm," *id.* at 192, New York's "proper cause" requirement allows for just that.

After the Civil War, several other states enacted similar laws notwithstanding the recent passage of the 14th Amendment. West Virginia and Texas enacted laws that broadly prohibited public carry without good cause. West Virginia's law made clear that "[i]f any person go armed with a deadly or dangerous weapon, without reasonable cause to fear violence to his person, family, or property, he may be required to give a recognizance." 1870 W. Va. Laws 702, 703, ch. 153, § 8.[10] Courts construed this self-defense exception narrowly to require specific evidence of a concrete, serious threat. *See, e.g.*, *Barnett*, 34 W. Va. 74. 1871 Tex. Laws 1322, art. 6512 (Prohibiting carry without "reasonable grounds for fearing an unlawful attack on his person.").

And then there are the early-20th-century laws, also deemed "longstanding" under *Heller*, 554 U.S. at 626. *See Kachalsky*, 701 F.3d at 90 n. 11 (noting that the laws deemed longstanding in *Heller* "were not enacted until the early twentieth century"). In 1906, Massachusetts enacted a modernized version of its 1836 law, by prohibiting carry without a license which could only be issued after a showing of "good reason to fear an injury to his person or property." 1906 Mass. Laws 150. In 1909, Alabama made it a crime for anyone "to carry a pistol about his person on premises not his own or under his control," but allowed a defendant to "give evidence that at the time of carrying the pistol he had good reason to apprehend an attack." 1909 Ala. Laws 258, no. 215, §§ 2, 4. In 1913, New York prohibited all public carry without a permit, which required a showing of "proper cause," the standard challenged in this case. 1913 N.Y. Laws 1627.[11]   A

---

[10]   A later version reaffirmed the law's breadth by clarifying that it did not "prevent any person from keeping or carrying about his dwelling house or premises, any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again." 1891 W. Va. Laws 915, 915–16, ch. 148, § 7. Violators could be fined or jailed. *Id.*

[11]   *See also* 1913 Haw. Laws 25, act 22, § 1 (Barring public carry without "good cause"); In the late nineteenth, century New York City had prohibited carrying concealed weapons unless

decade later, in 1923, the U.S. Revolver Association published a model law, which several states adopted, requiring a person to demonstrate a "good reason to fear an injury to his person or property" before obtaining a concealed-carry permit.[12] West Virginia also enacted a public-carry law around this time, prohibiting all carry absent good cause. *See* 1925 W. Va. Laws 25. And other states went further, prohibiting all public carry with no exception for good cause.[13]

**Beginning immediately after the 14th Amendment's ratification, many legislatures enact laws banning public carry specifically in populated areas.** Starting with New Mexico in 1869, many legislatures enacted Northampton-style prohibitions on public carry in cities and other populated areas. New Mexico made it "unlawful for any person to carry deadly weapons, either concealed or otherwise, on or about their persons within any of the settlements of this Territory," while providing a narrow self-defense exception. 1869 N.M. Laws 312, *Deadly Weapons Act of 1869*, § 1. Violators could serve up to 50 days in jail. *Id.* § 3. Wyoming prohibited carrying firearms "concealed or openly" "within the limits of any city, town or village." 1875 Wyo. Laws 352, ch. 52, § 1. Idaho made it unlawful "to carry, exhibit or flourish any … pistol, gun or other-deadly weapons, within the limits or confines of any city, town or village or in any public assembly." 1889 Idaho Laws 23, § 1. Arizona banned "any person within any settlement, town, village or city within this Territory" from "carry[ing] on or about his person, saddle, or in his saddlebags, any pistol." 1889 Ariz. Laws 16, ch. 13, § 1. And, at the turn

---

issued a license which required showing an "occasion to carry a pistol for his protection." Elliot Shepard, *Ordinances of the City of New York* 214 (1881).

[12]     *See* 1923 Cal. Laws 701, ch. 339; 1923 Conn. Laws 3707, ch. 252; 1923 N.D. Laws 379, ch. 266; 1923 N.H. Laws 138, ch. 118; 1925 Mich. Laws 473, no. 313; 1925 N.J. Laws 185, ch. 64; 1925 Ind. Laws 495, ch. 207; 1925 Or. Laws 468, ch. 260.

[13]     *See* 1890 Okla. Laws 495, art. 47, §§ 2, 5 (making it a crime for anyone "to carry upon or about his person any pistol, revolver," or "other offensive weapons" with certain exceptions); 1903 Okla. Laws 643, ch. 25, art. 45, § 584.

of the century, Texas and Michigan granted cities the power to "prohibit and restrain the carrying of pistols." 1909 Tex. Laws 105; *see* 1901 Mich. Laws 687, § 8.

By this time, many cities, such as Syracuse, N.Y. and Washington, D.C., had imposed such public-carry bans for decades.  Syracuse, N.Y., Ordinances ch. 27 (1885); Washington, D.C., Ordinance ch. 5 (1857).[14] "A visitor arriving in Wichita, Kansas, in 1873," for example, "would have seen signs declaring, 'LEAVE YOUR REVOLVERS AT POLICE HEADQUARTERS, AND GET A CHECK.'" Winkler, *Gunfight* 165 (2011). Dodge City was no different. A sign read: "THE CARRYING OF FIREARMS STRICTLY PROHIBITED." *Id.* Even in Tombstone, Arizona, people "could not lawfully bring their firearms past city limits. In fact, the famed shootout at Tombstone's O.K. Corral was sparked in part by Wyatt Earp pistol-whipping Tom McLaury for violating Tombstone's gun control laws." Blocher, *Firearm Localism*, 123 Yale L.J. 82, 84 (2013).

## CONCLUSION

In sum, a long tradition of American law makes clear that prohibitions on public carry—with or without a good-cause exception—were historically understood to be outside the scope of the Second Amendment. No historical evidence supports the contrary position that public carry was widely permitted in populous cities.

As applied here, New York's law—requiring "proper cause" before a person may carry a firearm on the populated streets of Brooklyn or Buffalo—fits squarely within our historical tradition, and is therefore constitutional. Were it otherwise, public-carry laws enacted by a

---

[14]     *See, e.g.*, Nebraska City, Neb., Ordinance no. 7 (1872); Nashville, Tenn., Ordinance ch. 108 (1873); Los Angeles, Cal., Ordinance nos. 35–36 (1878); Salina, Kan., Ordinance no. 268 (1879); La Crosse, Wis., Ordinance no. 14, § 15 (1880); Dallas, Tex., Ordinance (1887); New Haven, Conn., Ordinances § 192 (1890); Checotah, Okla., Ordinance no. 11 (1890); Rawlins, Wyo., Ordinances art. 7 (1893); Wichita, Kan., Ordinance no. 1641 (1899); San Antonio, Tex., Ordinance ch. 10 (1899); *When and Where May a Man Go Armed*, S.F. Bulletin, Oct. 26, 1866, at 5 ("[San Francisco] ordains that no person can carry deadly weapons").

majority of states and many cities by the early 20th century would have been unconstitutional.

This Court should reject that untenable position, and grant the Defendants' motion to dismiss.

Dated:  April 2, 2018                    EMERY CELLI BRINCKERHOFF
        New York, New York           & ABADY LLP

                                       _____/s_____
                                       Ilann M. Maazel
                                       O. Andrew F. Wilson
                                       600 Fifth Avenue, 10th Floor
                                       New York, NY 10020
                                       (212) 763-5000
                                     imaazel@ecbalaw.com

                                     EVERYTOWN FOR GUN SAFETY
                                     SUPPORT FUND
                                     Eric Tirschwell
                                     Mark Anthony Frassetto
                                     132 E. 43rd Street, # 657
                                     New York, NY 10017

                                     *Counsel for Amicus Curiae*
                                     *Everytown for Gun Safety*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 2, 2018, I electronically filed the foregoing with the Clerk of the Court of the United States District Court for the Northern District of New York by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the CM/ECF system.

_____/s/_____
Ilann M. Maazel