**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NEW YORK STATE RIFLE AND PISTOL ASSOCIATION, INC., *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No. 18-cv-134-BKS-ATB |
| GEORGE P. BEACH II, *et al.*, | ) ) | |
| *Defendants*. | ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS**

David H. Thompson*
Peter A. Patterson*
John D. Ohlendorf*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

    * Appearing *pro hac vice*

Kathleen McCaffrey Baynes
Bar Roll No. 507154
KATHLEEN MCCAFFREY BAYNES, ESQ., PLLC
    *Attorney of Record*
21 Everett Road Extension, Suite A-4
Albany, NY 12205
(518) 489-1098
(518) 489-3304 (fax)
kmb@kmbaynes.com

*Attorneys for Plaintiffs*

May 7, 2018

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.................................................................................................ii

INTRODUCTION ............................................................................................................... 1

STATEMENT ...................................................................................................................... 2

I.     New York's "Proper Cause" requirement ................................................................. 2

II.    Defendants' refusal to issue handgun carry licenses to Plaintiffs ....................... 3

ARGUMENT ....................................................................................................................... 4

I.     The conduct restricted by New York's "proper cause" requirement lies at the
      core of the Second Amendment. ............................................................................. 5

      A.    Text, history, precedent, and purpose all confirm that the right to keep
            and bear arms extends outside the home. .............................................. 5

      B.    *Kachalsky* erred in concluding that the right to carry firearms outside
            the home is not at the core of the Second Amendment. ....................... 13

II.    Under *Heller*, Defendants' requirement that law-abiding citizens demonstrate
      a special need for self-defense to exercise their Second Amendment rights is
      categorically unconstitutional.................................................................................. 16

III.   *Kachalsky* was wrong to uphold Defendants' "proper cause" restriction under
      intermediate scrutiny. ............................................................................................. 18

      A.    Strict scrutiny should apply. .................................................................. 18

      B.    Defendants' "proper cause" restriction fails even intermediate scrutiny,
            properly applied...................................................................................... 18

IV.   The Second Circuit's rule against associational standing is plainly inconsistent
      with Supreme Court precedent. .............................................................................. 24

CONCLUSION .................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Application of O'Connor*, 585 N.Y.S.2d 1000 (Sup. Ct. West. Cty. 1992) ................................... 3

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001).......................................................... 8

*Aymette v. State*, 21 Tenn. 154 (1840) ...................................................................... 15

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) .................................................... 10, 15

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ....................................... 18

*Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016)........................................................ 7

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ............................... 19

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ................................... 19

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ..................................... 1, 5, 6, 7, 9, 10, 11, 12, 13, 14, 16, 17

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016) .................................................... 5

*Drake v. Filko*, 724 F.3d 426 (3d Cir. 2013) ............................................................ 24

*Dred Scott v. Sandford*, 60 U.S. (19 How.) 393 (1857) ......................................... 12, 13

*Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872 (1990) ..................... 17

*First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) ..................................... 17

*Grace v. District of Columbia*, 187 F. Supp. 3d 124 (D.D.C. 2016).............................. 19, 20, 24

*Heller v. District of Columbia (Heller III)*, 801 F.3d 264 (D.C. Cir. 2015) .................... 19

*Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333 (1977)............................... 25

*Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012)......... 1, 2, 6, 7, 14, 15, 22, 23, 24

*Klenosky v. New York City Police Dep't*, 428 N.Y.S.2d 256 (1st Dep't 1980) ................... 1, 3, 17

*Martinek v. Kerik*, 743 N.Y.S.2d 801 (1st Dep't 2002) ............................................... 3

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014).......................................................... 24

*McDonald v. City of Chicago*, 561 U.S. 742 (2010).............................................. 8, 13, 16, 17, 18

*Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) ...................................... 6, 7, 8, 16, 20

*Myun-Uk Choi v. Tower Research Capital LLC*, 886 F.3d 229 (2d Cir. 2018) ........................ 4, 5

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)................... 5

*New York Times Co. v. United States*, 403 U.S. 713 (1971) ....................................... 17

*Nnebe v. Daus*, 644 F.3d 147 (2d Cir. 2011)............................................................ 25

*Nunn v. State*, 1 Ga. 243 (1846) ................................................................... 10, 15

*Parker v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007) ................................... 9

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014)..................................10

*Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686) .............................................................9

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973)................................18

*Shelby Cty., Ala. v. Holder*, 570 U.S. 529 (2013) .....................................................22

*Simpson v. State*, 13 Tenn. 356 (1833)...............................................................11, 12

*Sir John Knight's Case*, 87 Eng. Rep. 75 (K.B. 1686) ..............................................11

*State v. Chandler*, 5 La. Ann. 489 (1850) .................................................................15

*State v. Huntly*, 25 N.C. 418 (1843) .........................................................................11

*State v. Reid*, 1 Ala. 612 (1840) .........................................................................10, 15

*United States v. Hildenbrandt*, 378 F. Supp. 2d 44 (N.D.N.Y. 2005).....................5, 25

*United States v. Virginia*, 518 U.S. 515 (1996)........................................................20

*Warth v. Seldin*, 422 U.S. 490 (1975) .....................................................................25

*Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016).................................23

*Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. 2017)............7, 12, 13, 14, 15, 16 ,18, 20

**Constitutional and Statutory Provisions and Legislative Materials**

U.S. CONST. amend. II ............................................................................................1, 6

N.Y. PENAL LAW

§ 400.00(1) ......................................................................................................2

§ 400.00(2)(f) ...........................................................................................1, 2, 3

§ 400.00(3)(a) ..................................................................................................2

§ 400.00(4) ......................................................................................................2

Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832).....................................................12

An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165 ...........................................................................13

1836 Mass. Laws 748, 750, ch. 134, § 16 .................................................................12

2 Edw. 3, 258, c. 3 (1328) ...................................................................................10, 11

CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy).........................13

**Other**

John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE (Hazeltine et al. eds., 1905) ...............................................................10

Abhay Aneja, John J. Donohue III, & Alexandria Zhang, The Impact of Right to Carry Laws and the NRC Report (Dec. 1, 2014) (unpublished manuscript), *available at*

http://goo.gl/UOzB9H ................................................................................................ 21

4 WILLIAM BLACKSTONE, COMMENTARIES ............................................................ 8, 11

5 WILLIAM BLACKSTONE, COMMENTARIES (St. George Tucker ed., 1803) .................................. 9

*Legality of the London Military Foot-Association* (1780), *reprinted in* WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE (1785) .............................................................. 9

BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES (2010), http://goo.gl/6NAuIB .............................................. 8

Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041 (2009).......................... 20

Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309 (1991) .................................................... 12, 13

WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS (1893) .............................. 10

John J. Donohue et al., Right-to-Carry Laws and Violent Crime (June 12, 2017) ...................... 21

1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION (1906) ...................... 13

Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40 (2005), http://goo.gl/zOpJFL .......................... 21

Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151 (1986) ...................................... 23

1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN (1716)................................ 8, 11

CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY (1822) .............................................................................................................. 11

1 THE WORKS OF THOMAS JEFFERSON (letter of Aug. 19, 1785) (H. A. Washington ed., 1884) ................................................................................. 10

NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT (2012) ........................................................................................ 9

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150 (1995) .......................... 23

Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193 (1998)........................ 23, 24

WILLIAM LAMBARD, EIRENARCHA (1588)........................................................................ 11, 14

*Firearms*, Monticello, https://goo.gl/W6FSpM ...................................................... 10

David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY (Jens Ludwig & Philip J. Cook eds., 2003).......................................................... 20

NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005), http://goo.gl/WO1ZNZ............................................................................... 21, 23

*Gun Laws*, NRA-ILA, https://goo.gl/Nggx50 ...................................................... 20

Kara E. Rudolph et al., *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 AM. J. PUB. HEALTH 49 (2015) ...................................... 21

Michael Siegel, et. al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923 (2017) ....................... 22

HARLOW GILES UNGER, LION OF LIBERTY (2010) ........................................................ 10

Daniel Webster et al., *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. URBAN HEALTH 293 (2014) .................................... 21, 22

Webster, et al., Firearms on College Campuses (Oct. 15, 2016) ................................. 22

3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON (1804) .............................. 11

## INTRODUCTION

At the core of the Second Amendment lies "the individual right to possess and carry weapons in case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). When the people elevated that right into the Nation's fundamental charter, they did not intend to leave the freedom to exercise it at the mercy of the very government officials whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government . . . the power to decide on a case-by-case basis whether the right is *really worth* insisting upon." *Id.* at 634.

Defendants—state and local officials responsible for administering and enforcing New York's regulations governing carrying firearms outside the home—have imposed limits on "the right of the people to . . . bear Arms," U.S. CONST. amend. II, that flout these basic constitutional principles at every turn. New York has seized the very power forbidden it by the Second Amendment: the power to decide, on a case-by-case basis, whether an applicant for a license to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, has, in the estimation of its local licensing authorities, shown a sufficiently "proper cause" to exercise that right, N.Y. PENAL LAW § 400.00(2)(f). Worse still, the State has determined that a general desire to carry a weapon for self-defense is not a sufficiently good reason—demanding, instead, proof that a law-abiding citizen wishing to exercise the right has "a special need for self-protection distinguishable from that of the general community," *Klenosky v. New York City Police Dep't*, 428 N.Y.S.2d 256, 257 (1st Dep't 1980), *aff'd*, 53 N.Y.2d 685 (1981). Defendants have thus struck a balance *directly contrary* to the Constitution's demand that the right to self-defense—"the *central component*" of the Second Amendment, *Heller*, 554 U.S. at 599—must be "elevate[d] above all other interests." *Id.* at 635.

To be sure, as New York points out, the Second Circuit—in precedent we concede is binding on this Court at this stage in the litigation—has upheld New York's "proper cause" limit. *Kachalsky*

*v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012). But *Kachalsky* is deeply flawed, and it should be overturned at the first opportunity by a court competent to do so. *Kachalsky* does not meaningfully acknowledge the extensive textual and historical evidence demonstrating that the right to carry firearms for self-protection outside the home is at the very core of the Second Amendment. It adopts merely "intermediate" constitutional scrutiny, effectively relegating the right to bear arms to second-class status. And even if the choice of intermediate scrutiny were defensible, *Kachalsky*'s application of it—essentially deferring to the State's judgment without discussing or even *identifying* the empirical evidence on which that judgment was supposedly based—is not.

In sum, although this Court is presently bound by Second Circuit precedent to uphold it, New York's "proper cause" restriction is unconstitutional.

## STATEMENT

### I.   New York's "Proper Cause" requirement

Under New York law, an ordinary member of the general public who wishes to carry a handgun outside the home must first obtain a license to "have and carry [a handgun] concealed" (a "Handgun Carry License") pursuant to Section 400.00(2)(f) of New York's Penal Law. A person seeking such a license must submit an application to the Licensing Officer for the city or county where the applicant resides, on an application form approved by the Superintendent of the New York State Police, Defendant Beach. N.Y. PENAL LAW § 400.00(3)(a).

New York imposes a number of objective restrictions on the eligibility for a Handgun Carry License. For example, an applicant must be at least 21 years old, must not have been convicted of any felony or serious offense, must not be an unlawful user of a controlled substance, and must not have a history of mental illness. *Id.* § 400.00(1). Before issuing a license, the Licensing Officer must conduct a rigorous investigation and background check to verify that each of these statutory requirements is satisfied. *Id.* § 400.00(4).

In addition to these eligibility requirements, New York law also imposes a more subjective restriction on the availability of Handgun Carry Licenses: an applicant must demonstrate that "proper cause exists for the issuance thereof." *Id.* § 400.00(2)(f). While Licensing Officials retain some discretion in determining what constitutes "proper cause" under this standard, a significant body of New York case-law provides several examples of reasons that *do not* qualify. The courts have determined, for instance, that "[a] generalized desire to carry a concealed weapon to protect one's person and property does not constitute 'proper cause.' " *Application of O'Connor*, 585 N.Y.S.2d 1000, 1003 (Sup. Ct. West. Cty. 1992). They have further clarified that merely traveling through "high crime areas . . . is too vague to constitute 'proper cause' within the meaning of Penal Law § 400.00(2)(f)," *Martinek v. Kerik*, 743 N.Y.S.2d 80, 81 (1st Dep't 2002); instead, an applicant must "demonstrate a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession," *Klenosky*, 428 N.Y.S.2d at 257.[1]

Accordingly, typical New Yorkers—the vast majority of citizens who cannot "demonstrate a special need for self-protection distinguishable from that of the general community," *id.*—effectively remain subject to a ban on carrying handguns outside the home for self-defense.

## II.    Defendants' refusal to issue handgun carry licenses to Plaintiffs

Pursuant to this restriction, Defendants denied a request by Plaintiff Nash for a Handgun Carry License that would allow him to carry a handgun in public for self-defense. Mr. Nash, a resident of Rensselaer County, applied to his local Licensing Officer for a Handgun Carry License in late 2014. Complaint for Declaratory & Injunctive Relief ¶ 24 (Feb. 1, 2018), Doc. 1 ("Compl.").

---

[1] Some Licensing Officers grant what they call "restricted licenses," which are licenses that are marked by certain restrictions, such as "hunting and target." These licenses may be granted without a showing of a special need for self-defense, but they allow the licensee to carry a firearm *only* when engaged in the specified activities. Such a license thus *does not* permit the carrying of a firearm in public for the purpose of self-defense.

The Licensing Officer determined that Mr. Nash met all of the eligibility and training requirements imposed by New York law and granted his application on March 12, 2015. *Id.* But the license Mr. Nash was issued was marked "Hunting, Target only," and it thus allowed him to carry a firearm outside the home only while hunting and target shooting—not for the general purpose of self-protection. *Id.* ¶¶ 24–25.

Because he wanted to carry a firearm for self-defense, Mr. Nash requested the Licensing Officer, Defendant Richard N. McNally, Jr., to remove the "hunting and target" restrictions from his license and issue him a license allowing him to carry a firearm for self-protection. *Id.* ¶ 26. In support of this request, Mr. Nash cited a string of recent robberies in his neighborhood and the fact that he had recently completed an advanced firearm safety training course. *Id.* On November 1, 2016, after an informal hearing, Defendant McNally denied Mr. Nash's request and "determined that the 'Hunting, Target only' restrictions [shall] remain on your carry concealed permit." *Id* ¶ 27; *see also id.* at Ex. 2. Those restrictions, Defendant McNally emphasized, "are intended to *prohibit* you from carrying concealed in ANY LOCATION typically open to and frequented by the general public." *Id* ¶ 27; *see also id.* at Ex. 2. While Mr. Nash met all of New York's eligibility requirements, Defendant McNally concluded that he had failed to show "proper cause" because he did not demonstrate a special need for self-defense that distinguished him from the general public. *Id.* ¶ 28.[2]

## ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Myun-Uk Choi v. Tower*

---

[2] Defendants have also refused, on the basis of the "proper cause" requirement, to grant at least one member of organizational Plaintiff New York State Rifle and Pistol Association a license that would allow them to carry a firearm outside the home for self-defense. *Id.* ¶ 30.

*Research Capital LLC*, 886 F.3d 229, 234 (2d Cir. 2018) (quotation marks omitted). "[T]he only facts to be considered are those alleged in the complaint, and the court must accept them, drawing all reasonable inferences in the plaintiff's favor, in deciding whether the complaint alleges sufficient facts to survive." *Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

As Defendants point out, the Second Circuit held in *Kachalsky* that New York's "proper cause" restriction on the issuance of Handgun Carry Licenses is consistent with the Second Amendment. Because this Court "is required to follow precedent established by higher courts," *United States v. Hildenbrandt*, 378 F. Supp. 2d 44, 48 (N.D.N.Y. 2005), *aff'd*, 207 F. App'x 50 (2d Cir. 2006), Plaintiffs do not dispute that it must follow the controlling decision in *Kachalsky*, at this point in the proceedings. But *Kachalsky*'s ruling is deeply flawed, and as we show below, it should be overruled at the first opportunity by a court with authority to do so.

**I.      The conduct restricted by New York's "proper cause" requirement lies at the core of the Second Amendment.**

      **A.      Text, history, precedent, and purpose all confirm that the right to keep and bear arms extends outside the home.**

In *District of Columbia v. Heller*, the Supreme Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008). And although that landmark ruling did not purport to "clarify the entire field" of Second Amendment jurisprudence, *id.* at 635, *Heller* did set forth clear guidance about *the methodology* for deciding future disputes over the right to keep and bear arms. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," *id.* at 634–35, deciding whether a government restriction challenged on Second Amendment grounds can be squared with that provision involves a close "textual and historical analysis." *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 253 (2d Cir. 2015). Here, text, precedent, purpose, and history uniformly show that the carrying of firearms outside the

home for self-defense is squarely protected by the Second Amendment right.

1.      As even the *Kachalsky* court recognized, "[t]he plain text of the Second Amendment does not limit the right to bear arms to the home." 701 F.3d at 89 n.10. The substance of the Second Amendment right reposes in the twin verbs of the operative clause: "the right of the people to keep *and bear* Arms, shall not be infringed." U.S. CONST. amend. II (emphasis added). Because "[t]o speak of 'bearing' arms within one's home would at all times have been an awkward usage," the Constitution's explicit inclusion of the "right to bear arms thus implies a right to carry a loaded gun outside the home." *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012). Indeed, interpreting the Second Amendment as confined to the home would read the second of these guarantees—the right to bear arms—out of the Constitution's text altogether, for the right to keep arms, standing alone, would be sufficient to protect the right to have arms in the home.

2.      Confining the right to keep and bear arms to the home would also be at war with precedent. The Supreme Court's decision in "*Heller* repeatedly invokes a broader Second Amendment right than the right to have a gun in one's home." *Id.* at 935–36. For instance, *Heller* squarely holds that the Second Amendment "guarantee[s] the individual right to possess *and carry* weapons in case of confrontation," 554 U.S. at 592 (emphasis added), and it defines the key constitutional phrase "bear arms" as to " 'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,' " *id.* at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). *Heller*'s indication that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are "presumptively lawful" also implicitly recognizes a general right to bear arms in public; otherwise, there would be no need to identify exceptions. *Id.* at 626, 627 n.26. Moreover, *Heller*

6

extensively cites and significantly relies upon *Nunn v. State*, a nineteenth-century Georgia case that "struck down a ban on carrying pistols openly" under the Second Amendment. *Id.* at 612; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016) (vacating state court ruling that the Second Amendment does not protect the right to carry a stun gun in public).

While the Second Circuit in *Kachalsky* did not squarely address whether the Second Amendment applies outside the home, it assumed for the sake of analysis "that the Amendment must have *some* application" in public. 701 F.3d at 89. That assumption is consistent with the persuasive authority from other federal courts. Two circuit courts have directly held that the Second Amendment right to armed self-defense does not give out at the doorstep. *See Wrenn v. District of Columbia*, 864 F.3d 650, 661 (D.C. Cir. 2017); *Moore*, 702 F.3d at 935, 942. And *no* federal court of appeals has held that the Amendment *does not* apply outside the home.

3.      The very purposes behind the Second Amendment's codification show that it must protect the carrying of arms outside the home. As announced by its "prefatory" clause, the Amendment was designed in part "to prevent elimination of the militia." *Heller*, 554 U.S. at 599. A right to bear arms limited to the home would be ill-suited to "rearing up and qualifying a well-regulated militia," *id.* at 612 (quoting *Nunn v. State*, 1 Ga. 243, 251 (1846)), for if citizens could be prohibited from carrying arms in public, they simply could not act as the militia at all.

Of course, the militia was not "the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting." *Id.* at 599. Hunting obviously cannot be conducted by those bearing arms only within their homes. And the same reasoning applies with even more force to the "the *central component*" of the Second Amendment right: self-defense. *Id.* at 599. There is nothing in the Court's language to suggest that this core purpose may only be pursued in the home. Nor is there any such suggestion in the Amendment's

text. And "one doesn't have to be a historian to realize that a right to keep and bear arms for personal self-defense in the eighteenth century could not rationally have been limited to the home." *Moore*, 702 F.3d at 936. "The Supreme Court has decided that the [Second Amendment] confers a right to bear arms for self-defense, which is as important outside the home as inside." *Id.* at 942. Indeed, according to the latest nationwide data from the Bureau of Justice Statistics, 18.4% of violent crimes occur at or in the victim's home, while 26.5% occur on the street or in a parking lot or garage.[3] Thus, "[t]o confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*." *Moore*, 702 F.3d at 937.

4.      Finally, the historical understanding of the right to keep and bear arms conclusively confirms that it extends outside the home.

As *McDonald v. City of Chicago* explains, "[s]elf-defense is a basic right, recognized by many legal systems from ancient times to the present day." 561 U.S. 742, 767 (2010). And because the need for self-defense may *arise* in public, it has long been recognized that the right to self-defense may be *exercised* in public. Thus, "[i]f any person attempts a robbery or murder of another, *or* attempts to break open a house in the night time, . . . and shall be killed in such attempt, the slayer shall be acquitted and discharged." 4 WILLIAM BLACKSTONE, COMMENTARIES *180 (emphasis added). "Sergeant William Hawkins's widely read Treatise of the Pleas of the Crown," *Atwater v. City of Lago Vista*, 532 U.S. 318, 331 (2001), likewise explained that "the killing of a Wrong-doer . . . may be justified . . . where a Man kills one who assaults him in the Highway to rob or murder him," 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 71 (1716).

Because the right to self-defense was understood to extend beyond the home, the right to

---

[3] BUREAU OF JUSTICE STATISTICS, CRIMINAL VICTIMIZATION IN THE UNITED STATES, 2008 STATISTICAL TABLES tbl. 61 (2010), http://goo.gl/6NAuIB.

*armed* self-defense naturally was as well. Accordingly, by the late seventeenth century the English courts recognized that it was the practice and privilege of "gentlemen to ride armed for their security." *Rex v. Knight*, 90 Eng. Rep. 330 (K.B. 1686). A century later, the Recorder of London—a judge and "the foremost legal advisor to the city," *Parker v. District of Columbia*, 478 F.3d 370, 382 n.8 (D.C. Cir. 2007)—opined that "the right of his majesty's Protestant subjects, to have arms for their own defence, and to use them for lawful purposes, is most clear and undeniable," *Legality of the London Military Foot-Association* (1780), *reprinted in* WILLIAM BLIZZARD, DESULTORY REFLECTIONS ON POLICE 59 (1785). These "lawful purposes, for which arms may be used," were not limited to the home, for they included "immediate self-defence, . . . suppression of violent and felonious breaches of the peace, the assistance of the civil magistrate in the execution of the laws, and the defence of the kingdom against foreign invaders." *Id.* at 63.

That understanding was shared on this side of the Atlantic. Indeed, "about half the colonies had laws *requiring* arms-carrying in certain circumstances," such as when traveling. NICHOLAS J. JOHNSON & DAVID B. KOPEL ET AL., FIREARMS LAW & THE SECOND AMENDMENT 106–08 (2012) (emphasis added). Plainly, if the law imposed on individuals a duty to bear arms "for public-safety reasons," *Heller*, 554 U.S. at 601, it necessarily conferred a corresponding right to do so. And that understanding endured in the next century, both before and after the Revolution. Indeed, as Judge St. George Tucker observed in 1803, "[i]n many parts of the United States, a man no more thinks, of going out of his house on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side." 5 WILLIAM BLACKSTONE, COMMENTARIES App. n.B, at 19 (St. George Tucker ed., 1803). And Tucker made clear that Congress would exceed its authority were it to "pass a law prohibiting any person from bearing arms." 1 *id.* App. n.D, at 289.

The practices of the Founding generation confirm that the right to carry arms was well-

established. George Washington, for example, carried a firearm on an expedition into the Ohio Country. WILLIAM M. DARLINGTON, CHRISTOPHER GIST'S JOURNALS 85–86 (1893). Thomas Jefferson advised his nephew to "[l]et your gun . . . be the constant companion of your walks," 1 THE WORKS OF THOMAS JEFFERSON 398 (letter of Aug. 19, 1785) (H. A. Washington ed., 1884), and Jefferson himself traveled with pistols for self-protection and designed a holster to allow for their ready retrieval, *see Firearms*, Monticello, https://goo.gl/W6FSpM. Even in defending the British soldiers charged in the Boston Massacre, John Adams conceded that, in this country, "every private person is authorized to arm himself; and on the strength of this authority I do not deny the inhabitants had a right to arm themselves at that time for their defence." John Adams, *First Day's Speech in Defence of the British Soldiers Accused of Murdering Attucks, Gray and Others, in the Boston Riot of 1770, in* 6 MASTERPIECES OF ELOQUENCE 2569, 2578 (Hazeltine et al. eds., 1905). And as an attorney, Patrick Henry regularly carried a firearm while walking from his home to the courthouse. HARLOW GILES UNGER, LION OF LIBERTY 30 (2010). This understanding was also reflected in contemporary judicial decisions. As the panel decision in *Peruta v. County of San Diego* concluded after an exhaustive survey of the early-American case law, although "some courts approved limitations on the manner of carry outside the home, none approved a total destruction of the right to carry in public." 742 F.3d 1144, 1160 (9th Cir. 2014), *vacated*, 781 F.3d 1106 (9th Cir. 2015) (en banc); *see also, e.g.*, *Nunn*, 1 Ga. at 243, 249–51; *State v. Reid*, 1 Ala. 612, 616–17 (1840); *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–93 (1822).

To be sure, the right to bear arms is not a right to "carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. For example, in the pre-history of the Second Amendment, the medieval Statute of Northampton provided that "no man great nor small" shall "go nor ride armed by night nor by day, in fairs, markets, nor in the presence

of the justices or other ministers, nor in no part elsewhere." 2 Edw. 3, 258, c. 3 (1328). But contrary to amicus Everytown for Gun Safety's revisionist version of history, Northampton—and the analogues adopted on this side of the Atlantic—did not "broadly prohibit[ ] public carry in populated places." Mem. of Everytown for Gun Safety as Amicus Curiae 7 (Apr. 2, 2018), Doc. 23-3 ("Everytown Amicus"). To the contrary, by the seventeenth century the courts and commentators had conclusively interpreted the provision as limited to "prohibiting the carrying of 'dangerous and unusual weapons,' " *Heller*, 554 U.S. at 627—weapons not protected by the right to keep and bear arms, *id.* at 623–24, 627—or otherwise "go[ing] armed to terrify the King's subjects," *Sir John Knight's Case*, 87 Eng. Rep. 75, 76 (K.B. 1686). And this rule against "*riding or going armed*, with dangerous or unusual weapons" and thereby "terrifying the good people of the land," 4 WILLIAM BLACKSTONE, COMMENTARIES *148–49, was not understood as extending to the ordinary carrying of weapons "usually worne and borne," WILLIAM LAMBARD, EIRENARCHA 135 (1588), unless "accompanied with such circumstances as are apt to terrify the people," 1 HAWKINS, *supra*, at 136.

Early American courts and commentators shared this understanding of the scope of the right to bear arms in self-defense. For instance, James Wilson, a leading Framer and Supreme Court Justice, explained in his widely read Lectures on Law that it was unlawful only to carry "dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON 79 (1804). After all, as another commentator explained, "in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily." CHARLES HUMPHREYS, A COMPENDIUM OF THE COMMON LAW IN FORCE IN KENTUCKY 482 (1822); *see also State v. Huntly*, 25 N.C. 418, 422–23 (1843); *Simpson v. State*, 13

Tenn. 356, 359–60 (1833).[4]

This reading of the Second Amendment persisted throughout the nineteenth century. Reconstruction Era views are "instructive" evidence of the Second Amendment's scope because they reflect "*the public understanding* of [the Amendment] in the period after its enactment." *Heller*, 554 U.S. at 605, 614. And those who wrote and ratified the Fourteenth Amendment clearly understood the right to bear arms to protect the carrying of firearms outside the home for self-defense.

For decades before the Civil War, the southern States had schemed at every turn to prevent their enslaved and free black populations from bearing arms. An 1832 Delaware law, for example, forbade any "free negroes [or] free mulattoes to have own keep or possess any Gun [or] Pistol," unless they first received a permit from "the Justice of the Peace" certifying "that the circumstances of his case justify his keeping and using a gun." Act of Feb. 10, 1832, sec. 1, Del. Laws 180 (1832); *see also* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration*, 80 GEO. L.J. 309, 336–38 (1991) (citing similar laws in Texas, Mississippi, Louisiana, South Carolina, Maryland, Virginia, and Georgia). Indeed, Chief Justice Taney recoiled so strongly from recognizing African Americans as citizens in the infamous *Dred Scott* case precisely because he understood that doing so would entitle them "to keep and carry arms

---

[4] Everytown also cites a handful of laws enacted in the mid-1800s that required any person who bore arms in public to post a deposit or "surety" "for keeping the peace" upon complaint of "any person having reasonable cause to fear an injury, or breach of the peace," unless he himself could show that he had "reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property." 1836 Mass. Laws 748, 750, ch. 134, § 16; *see* Everytown Amicus 11–13. But these surety-style laws "did not deny a responsible person carrying rights unless he showed a special need for self-defense. They only burdened someone reasonably accused of posing a threat. And even he could go on carrying without criminal penalty. He simply had to post money that would be forfeited if he breached the peace or injured others—a requirement from which he was exempt if *he* needed self-defense." *Wrenn*, 864 F.3d at 661.

wherever they went." *Dred Scott v. Sandford*, 60 U.S. (19 How.) 393, 417 (1857).

After the Civil War, these noxious efforts to suppress the rights of former slaves to carry arms for self-defense continued. Mississippi's notorious "Black Code," for example, forbade any "freedman, free negro or mulatto" to "keep or carry fire-arms of any kind." An Act To Punish Certain Offences Therein Named, and for Other Purposes, ch. 23, § 1, 1865 Miss. Laws 165. Parallel restrictions were enacted in Louisiana and Alabama. Cottrol & Diamond, *supra*, at 344–45. And in an ordinance strikingly similar in operation to New York's "proper cause" law, several Louisiana towns provided that no freedman "shall be allowed to carry fire-arms, or any kind of weapons, within the parish" without the approval of "the nearest and most convenient chief of patrol." 1 WALTER L. FLEMING, DOCUMENTARY HISTORY OF RECONSTRUCTION 279–80 (1906).

As the Supreme Court explained at length in *McDonald*, the Reconstruction Congress labored mightily to entomb this legacy of prejudice. *See* 561 U.S. at 770–77. Congress's efforts culminated in the adoption of the Fourteenth Amendment, which ensured the right of every American, regardless of race, to "bear arms for the defense of himself and family and his homestead." CONG. GLOBE, 39th Cong., 1st Sess. 1182 (1866) (statement of Sen. Pomeroy); *see also McDonald*, 561 U.S. at 775–76.

### B.   *Kachalsky* erred in concluding that the right to carry firearms outside the home is not at the core of the Second Amendment.

The right to "carry weapons in case of confrontation," *Heller*, 554 U.S. at 592, is not only within the scope of the Second Amendment, it lies at the very core of that guarantee. *Heller* makes clear that the right to individual self-defense is "the *central component*" of the Second Amendment. *Id.* at 599. Given that the Second Amendment's text, history, and purposes all show that its protections extend outside the home, the right to carry firearms "for the core lawful purpose of self-defense" necessarily extends beyond those four walls as well. *Id.* at 630. "Thus, the Amendment's

13

core generally covers carrying in public for self-defense." *Wrenn*, 864 F.3d at 659.

*Kachalsky* disagreed with this conclusion. While assuming for the sake of argument "that the Amendment must have *some* application in the . . . context of the public possession of firearms," the Second Circuit held that bearing arms in public "falls outside the core Second Amendment protections identified in *Heller*." *Kachalsky*, 701 F.3d at 89, 94. That reasoning fails for multiple reasons. To begin, because *Kachalsky* failed to conduct any meaningful textual and historical analysis of whether the Second Amendment applies outside the home, it had little basis for concluding that the right to bear arms outside the home "falls outside the core" of the Second Amendment. *Id.* at 94. While the Second Circuit's decision to "proceed[ ] on this assumption" that the Second Amendment applies in public, *id.* at 89, may have been "meant to be generous to the plaintiffs, by granting a premise in their favor," its effect was to sweep under the rug the overwhelming historical and textual support, discussed above, for the conclusion that the right to bear arms in public lies at the very heart of the Second Amendment. *Wrenn*, 864 F.3d at 663.

Instead of grappling with the historical evidence discussed above, *Kachalsky* instead cited a series of laws, dating from the nineteenth century and later, which targeted the carrying of *concealed* weapons.[5] These laws, according to the Second Circuit, evinced "a longstanding tradition

---

[5] The only historical restrictions cited by *Kachalsky* that date to the founding period—the most relevant historical time frame for determining the scope of the Second Amendment, *see Heller*, 554 U.S. at 614—are: (1) scattered eighteenth-century state laws "prohibit[ing] the use of firearms on certain occasions and in certain locations" and regulating "the storage of gun powder"; and (2) the versions of the Statute of Northampton enacted in North Carolina, Massachusetts, and Virginia. *Kachalsky*, 701 F.3d at 95 & n.19. The first type of colonial-era restrictions were also a cornerstone of Justice Breyer's *dissent* in *Heller*, *see* 554 U.S. at 683–84 (Breyer, J., dissenting), and the majority *expressly rejected* the relevance of these narrow and minor limits on firing arms in certain situations (such as during New Year's Day celebrations), concluding that they "provide no support" for across-the-board, significant restrictions, like New York's here, *id.* at 631–33 (majority). And for the reasons discussed above, *see supra*, pp. 10–12, Northampton and its colonial and state analogues were simply not understood as applying to the carrying of weapons "usually worne and borne" for otherwise lawful purposes like self-defense. Eirenarcha, *supra*, at 135.

of states regulating firearm possession and use in public because of the dangers posed to public safety." *Kachalsky*, 701 F.3d at 94–95. Not so. While these laws limited the carrying of *concealed* firearms—a practice that was considered dishonorable and especially dangerous by the social mores of the day—they did so against the background of *freely allowing* the *open* carrying of arms, thus "le[aving] ample opportunities for bearing arms." *Wrenn*, 864 F.3d at 662.

The fact that these laws left intact the background right to carry firearms in *some* manner was absolutely *critical* to most of the judicial opinions assessing their constitutionality. The distinction was relied upon by courts that upheld this type of law against constitutional challenge. *See State v. Chandler*, 5 La. Ann. 489, 490 (1850) (concealed carry ban "interfered with no man's right to carry arms . . . 'in full open view,' " and thus did not interfere with "the right guaranteed by the Constitution of the United States"); *Aymette v. State*, 21 Tenn. 154, 160–61 (1840); *State v. Reid*, 1 Ala. 612, 616–17 (1840). And it was also endorsed by the opinions *striking down* limitations on carrying firearms that cut too close to the core. *See Nunn*, 1 Ga. at 251 (limitation on "the practice of carrying certain weapons *secretly*" was "valid, inasmuch as it does not deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms," but "prohibition against bearing arms *openly*" was "in conflict with the Constitution, and *void*"); *see also Bliss*, 12 Ky. at 91–94.[6] These laws thus provide no historical pedigree for restrictions, like New York's, which prohibit *both* open and concealed carrying and thus add up to "a denial of the right altogether." *Aymette*, 21 Tenn. at 161.

Had *Kachalsky* fairly engaged in the textual and historical analysis required by *Heller*, it

---

[6] A few courts from this era upheld concealed carry bans without relying on this distinction, but as *Kachalsky* itself notes, they did so "on the basis of an interpretation of the Second Amendment . . . that conflicts with [*Heller*.]" 701 F.3d at 91 n.14. Those outlier decisions are thus "sapped of authority by *Heller*," and cannot be cited as reliable guides to the Second Amendment's scope. *Wrenn*, 864 F.3d at 658.

would have reached the same conclusion as the two circuits that *have* treated seriously with the Second Amendment's text and history. *See Wrenn*, 864 F.3d at 661; *Moore*, 702 F.3d at 937, 942. For as shown above, these sources of authority leave no doubt that this constitutional guarantee extends outside the home. *See supra*, Part I.A. And because that is so, the right to *bear* arms "for the core lawful purpose of self-defense," *Heller*, 554 U.S. at 630, can be no further from the heartland of the Second Amendment than the right to *keep* them.

II.     **Under *Heller*, Defendants' requirement that law-abiding citizens demonstrate a special need for self-defense to exercise their Second Amendment rights is categorically unconstitutional.**

Given that the core of the Second Amendment extends to armed self-defense outside the home, *Heller* makes the next analytical steps clear. Because "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon," wholesale infringements upon the Amendment's "core protection" must be held unconstitutional categorically, not "subjected to a freestanding 'interest-balancing' approach." *Heller*, 554 U.S. at 634. Defendants' prohibition is just such an infringement of core Second Amendment conduct. Accordingly, it is flatly unconstitutional.

*Heller* requires *per se* invalidation of broad bans that strike at the heart of the Second Amendment. In *Heller*, the Supreme Court declined the invitation to analyze the ban on possessing handguns at issue under "an interest-balancing inquiry" based on the "approach . . . the Court has applied . . . in various constitutional contexts, including election-law cases, speech cases, and due process cases," 554 U.S. at 689–90 (Breyer, J., dissenting), ruling instead that the right to keep and bear arms was "elevate[d] above all other interests" the moment that the People chose to enshrine it in the Constitution's text, *id.* at 635 (majority opinion). And in *McDonald*, the Court reaffirmed that *Heller* "expressly rejected the argument that the scope of the Second Amendment right should

16

be determined by judicial interest balancing." 561 U.S. at 785 (plurality opinion).

Defendants' demand that applicants show a need for self-defense that is "distinguishable from that of the general community," *Klenosky*, 428 N.Y.S.2d at 257, *extinguishes* the core Second Amendment rights of *typical* citizens—who, by definition, cannot distinguish their need for self-defense from that of the general population. To be sure, Defendants' limits allow individuals who can show "a special need for self-protection" to carry firearms, if they can demonstrate that need in advance to the satisfaction of the government. *Id.* But the Second Amendment does not set up a race between law-abiding citizens and their assailants to the license bureau. For those whose lives or safety are being threatened, it is cold comfort to know that they could have carried a firearm *if only they could have documented their "special need for self-protection" in advance*. Surely under the Second Amendment—which protects the right to bear arms "*in case* of confrontation," *Heller*, 554 U.S. at 592 (emphasis added)—that scheme turns the right to bear arms on its head.

Indeed, the State's demand that a citizen prove to its satisfaction that he has a good enough reason to carry a handgun is flatly inconsistent with the very nature of the Second Amendment right. The existence of that right is itself reason enough for its exercise. It is thus no surprise that courts have rejected this kind of "ask-permission-first" regime across a wide variety of constitutional rights, reasoning that the government has failed to honor a right if it demands to know—and assess *de novo*—the reasons justifying each occasion of its exercise. *See, e.g.*, *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765 (1978) (government cannot condition speech on "a requirement that the speaker have a sufficiently great interest in the subject to justify communication"); *New York Times Co. v. United States*, 403 U.S. 713, 714 (1971) (prior restraint presumptively unconstitutional); *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990) (government cannot "question the centrality" or "plausibility" of religious

convictions); *see also Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2778 (2014).

In short, as the D.C. Circuit persuasively concluded, a proper-cause-type requirement that limits the carrying of firearms outside the home to those with a "heightened need" for self-defense "is necessarily a total ban on most . . . residents' right to carry a gun in the face of ordinary self-defense needs." *Wrenn*, 864 F.3d at 666. Indeed, such a restriction "destroys the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . , but by design: it looks precisely for needs 'distinguishable' from those of the community." *Id.* Such a prohibition is unconstitutional *per se*.

**III.   *Kachalsky* was wrong to uphold Defendants' "proper cause" restriction under intermediate scrutiny.**

    **A.   Strict scrutiny should apply.**

Even if Defendants' restrictions were not *categorically* unconstitutional, they should at the least be subjected to the highest level of constitutional scrutiny. As the Supreme Court has explained, "strict judicial scrutiny [is] required" whenever a law "impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973). And the right to bear arms is not only enumerated in the constitutional text; it was also counted "among those fundamental rights necessary to our system of ordered liberty" by "those who drafted and ratified the Bill of Rights." *McDonald*, 561 U.S. at 768, 778. *Kachalsky*'s application of merely intermediate scrutiny, by contrast, relegates the Second Amendment to "a second-class right." *Id.* at 780 (plurality).

    **B.   Defendants' "proper cause" restriction fails even intermediate scrutiny, properly applied.**

Ultimately determining the correct standard of scrutiny is immaterial, however, because the "proper cause" restriction should be struck down under *any* level of heightened scrutiny.

    1.   That is so, first, as a matter of law. By design, Defendants' restrictions will reduce

firearm violence *only by reducing the quantity of firearms in public*. That is "not a permissible strategy"—even if used as a means to the further end of increasing public safety. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 148 (D.D.C. 2016), *aff'd sub nom. Wrenn v. District of Columbia*, 864 F.3d 650. That conclusion follows directly from the Supreme Court's precedents in the secondary-effects area of free speech doctrine.

The Supreme Court has held that government restrictions on certain types of expressive conduct—most commonly, zoning ordinances that apply specifically to establishments offering adult entertainment—are subject to merely intermediate scrutiny even though they are content-based. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–51 (1986). But this lesser scrutiny applies only so long as the *purpose and effect* of the restrictions is to reduce the negative "secondary effects" of the expression—such as the increased crime that occurs in neighborhoods with a high concentration of adult theaters—rather than to suppress the expression itself. *Id.* at 49. As Justice Kennedy's controlling opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002), makes clear, in defending a restriction as narrowly tailored to further an important or substantial governmental interest, the government may not rely on the proposition "that it will reduce secondary effects by reducing speech in the same proportion." *Id.* at 449. "It is no trick to reduce secondary effects by reducing speech or its audience; but [the government] may not attack secondary effects indirectly by attacking speech." *Id.* at 450; *see also Heller v. District of Columbia (Heller III)*, 801 F.3d 264, 280 (D.C. Cir. 2015); *Grace*, 187 F. Supp. 3d at 148.

But that is precisely what Defendants have done here. Their restrictive licensing policies do not regulate the *manner* of bearing arms or impose reasonable training and safety requirements. No, their purpose and effect is to *limit the number of arms borne in public*, and to the extent this leads to a reduction of gun crime, that is only a byproduct of this suppression of the quantity of core

19

Second Amendment conduct. As the D.C. Circuit concluded, limits like Defendants' "proper cause" restriction "destroy[ ] the ordinarily situated citizen's right to bear arms not as a side effect of applying other, reasonable regulations . . . but by design." *Wrenn*, 864 F.3d at 666. That is "not a permissible strategy," *Grace*, 187 F. Supp. 3d at 148, under any level of heightened scrutiny.

2.     Even if these objections are set aside, the heightened need requirement still flunks intermediate scrutiny, and *Kachalsky* was still wrong to uphold it. To survive intermediate scrutiny, a restriction must be "substantially related to the achievement" of the government's objective. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "The burden of justification is demanding and it rests entirely on the State." *Id.* As Judge Posner concluded after surveying "the empirical literature on the effects of allowing the carriage of guns in public," that data does not provide "more than merely a rational basis for believing that [a ban on public carriage] is justified by an increase in public safety." *Moore*, 702 F.3d at 939, 942.

This is confirmed by experience. Forty-two States do not restrict the carrying of firearms to a privileged few. *See Gun Laws*, NRA-ILA, https://goo.gl/Nggx50. Yet "many years of evidence across different states and time periods overwhelmingly rejects" the claim that "permit holders will use their guns to commit crimes instead of using their guns for self-defense." David B. Mustard, *Comment*, *in* EVALUATING GUN POLICY 325, 330 (Jens Ludwig & Philip J. Cook eds., 2003); *see also id.* at 330–31. As social scientists who favor gun control have acknowledged, there would be "relatively little public safety impact if courts invalidate laws that prohibit gun carrying outside the home, assuming that some sort of permit system for public carry is allowed to stand," since "[t]he available data about permit holders . . . imply that they are at fairly low risk of misusing guns." Philip J. Cook et al., *Gun Control After* Heller, 56 UCLA L. REV. 1041, 1082 (2009).

Further, even if laws that more freely grant permits have not been shown to decrease crime,

there is no persuasive evidence that they *increase* crime—and that is the proposition Defendants must substantiate. For instance, in 2004 the National Academy of Sciences' National Research Council ("NRC") conducted an exhaustive review of the relevant social-scientific literature. The NRC concluded that "with the current evidence it is not possible to determine that there is a causal link between the passage of right-to-carry laws and crime rates." NATIONAL RESEARCH COUNCIL, FIREARMS AND VIOLENCE: A CRITICAL REVIEW 150 (Charles F. Wellford, John V. Pepper, & Carol V. Petrie eds., 2005), http://goo.gl/WO1ZNZ. *See also* Robert Hahn et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 AM. J. PREVENTATIVE MED. 40, 53–54 (2005), http://goo.gl/zOpJFL (CDC study concluding that existing evidence does not establish that more permissive carry regimes "increases rates of unintended and intended injury").

Defendants cite several studies in an effort to shore up the public-safety justification of their ban, but they fall short. New York's primary piece of evidence is an unpublished 2014 study by Abhey Aneja, John Donahue III, and Alexandria Zhang. But the 2014 Donohue study in fact *explicitly affirms* the NRC's judgment that the evidence is not sufficient to show *any causal link* between laws limiting public carrying of firearms and crime rates. Abhay Aneja, John J. Donohue III, & Alexandria Zhang, The Impact of Right to Carry Laws and the NRC Report 80 (Dec. 1, 2014) (unpublished manuscript), *available at* http://goo.gl/UOzB9H; *see also* John J. Donohue et al., Right-to-Carry Laws and Violent Crime 44 (June 12, 2017) (unpublished manuscript).

The other studies cited by Defendants add little. Most concern gun control measures *other* than restrictions on the right to carry—such as permitting requirements for the *purchase* of firearms—and thus do not even *purport* to address carrying outside the home. *See* Kara E. Rudolph et al., *Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides*, 105 AM. J. PUB. HEALTH 49 (2015); Daniel Webster et al., *Effects of the Repeal of Missouri's Handgun*

*Purchaser Licensing Law on Homicides*, 91 J. URBAN HEALTH 293 (2014).[7] Another paper is merely a recapitulation of other research—on the issue of public carrying, principally the unpublished Aneja and Donohue study—and thus contributes nothing to the debate. Webster, et al., Firearms on College Campuses 15 (Oct. 15, 2016) (unpublished manuscript). And while the remaining study—Michael Siegel, et. al., *Easiness of Legal Access to Concealed Firearm Permits and Homicide Rates in the United States*, 107 AM. J. PUB. HEALTH 1923 (2017)—does at least concern public carrying, like the NRC and the Donohue study, it explicitly cautions that it does *not* find *any causal link* between more permissive carry regimes and violent crime. *See id.* at 1928.

The cursory discussion of the empirical evidence offered by *Kachalsky* is even less convincing. The sum total of the "evidence" discussed by the court in purportedly conducting intermediate scrutiny was confined to: (1) naked assertions about "the dangers inherent in the carrying of handguns in public" that were "made one-hundred years ago" by New York's legislature, 701 F.3d at 97, and (2) unnamed "studies and data demonstrating that widespread access to handguns in public increases the likelihood that felonies will result in death," *id.* at 99, that New York submitted in its briefing—studies which the court did not feel the need to discuss or *even specifically identify*. But a law that "imposes current burdens and must be justified by current needs," *Shelby Cty., Ala. v. Holder*, 570 U.S. 529, 536 (2013)—not by assumptions a legislature made over a hundred years ago. And merely invoking the fact that the State "submitted studies and data" supporting its law in its briefing, *with no actual analysis of those studies or data*, hardly

---

[7] Defendants characterize these studies as showing that Missouri and Connecticut's repeal of their "handgun licensing laws" was associated with dramatic increases in firearm homicide rates. Mem. of Law in Supp. of Defs.' Mot. to Dismiss the Compl. at 8 (Mar. 26, 2018), Doc. 19-1. What Defendants somewhat surprisingly fail to mention is that the "handgun licensing laws" in question governed *purchasing* firearms, not carrying them in public—and imposed objective eligibility requirements, not a discretionary "proper cause"-type restriction like the one challenged here. These studies are utterly irrelevant.

discharges the court's duty to "assure that, in formulating its judgments, [the State] has drawn reasonable inferences based on substantial evidence." *Kachalsky*, 701 F.3d at 97, 99.

The lack of evidence that these laws advance public safety should not be surprising, because violent criminals will continue to carry guns in public regardless. As the Supreme Court recently held in the context of abortion restrictions, "[d]etermined wrongdoers, already ignoring existing statutes and safety measures, are unlikely to be convinced to [change their conduct] by a new overlay of regulations." *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313–14 (2016). This is not a novel proposition. In a passage Thomas Jefferson copied into his personal quotation book, the influential Italian criminologist Cesare Beccaria reasoned that laws forbidding the

> wear[ing of] arms . . . disarm[] those only who are not disposed to commit the crime which the laws mean to prevent. Can it be supposed, that those who have the courage to violate the most sacred laws of humanity, and the most important of the code, will respect the less considerable and arbitrary injunctions, the violation of which is so easy, and of so little comparative importance? . . . [Such a law] certainly makes the situation of the assaulted worse, and of the assailants better, and rather encourages than prevents murder.

*See* Stephen P. Halbrook, *What the Framers Intended: A Linguistic Analysis of the Right To "Bear Arms,"* 49 LAW & CONTEMP. PROBS. 151, 154 (1986).

Instead of criminals, it is primarily the *law-abiding* who are affected by Defendants' restrictions. And that effect has very real public-safety *costs*—costs that Defendants entirely ignore. Although the number of defensive gun uses is difficult to measure, the leading study on the issue "indicate[s] that each year in the U.S. there are about 2.2 to 2.5 million [defensive uses of guns] of all types by civilians against humans." Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 164 (1995). "At least 19 other surveys have resulted in [similar] estimated numbers of defensive gun uses." NATIONAL RESEARCH COUNCIL, *supra*, at 103. Many of these defensive gun uses involve carrying firearms in public. The National Self-Defense Survey indicates that "anywhere from

670,000 to 1,570,000 [defensive gun uses] a year occur in connection with gun carrying in a public place." Gary Kleck & Marc Gertz, *Carrying Guns for Protection: Results from the National Self-Defense Survey*, 35 J. RESEARCH IN CRIME & DELINQUENCY 193, 195 (1998). Any realistic appraisal of existing social-scientific data thus leads inexorably to the conclusion that the "good reason" requirement cannot be shown to benefit public safety—but it may well harm it.

3.      Finally, even if Defendants' "proper cause" restriction did advance public safety, it independently fails heightened scrutiny because it is not properly tailored to the government's asserted goals. While laws subject to intermediate scrutiny "need not be the least restrictive or least intrusive means of serving the government's interests," they still must be narrowly tailored, possessing "a close fit between ends and means." *McCullen v. Coakley*, 134 S. Ct. 2518, 2534–35 (2014) (quotation marks omitted). Here, there is an utter lack of fit between Defendants' restrictions and their purported objective of public safety. After all, "the fact that a person can demonstrate a heightened need for self-defense says nothing about whether he or she is more or less likely to misuse a gun." *Grace*, 187 F. Supp. 3d at 149. "This limitation will neither make it less likely that those who meet the [good reason] requirement will accidentally shoot themselves or others, nor make it less likely that they will turn to a life of crime. Put simply, the solution is unrelated to the problem it intends to solve." *Drake v. Filko*, 724 F.3d 426, 454 (3d Cir. 2013) (Hardiman, J., dissenting).

## IV.   The Second Circuit's rule against associational standing is plainly inconsistent with Supreme Court precedent.

There is no dispute that Plaintiff Nash has standing. *See* Compl. ¶¶ 23, 28–29. "Where, as here, at least one plaintiff has standing, jurisdiction is secure," and the Court thus need not address NYSRPA's standing to bring suit on behalf of its members. *Kachalsky*, 701 F.3d at 84 n.2.

To the extent the Court does reach the issue of NYSRPA's standing, Plaintiffs acknowledge

that the Second Circuit's case law does hold "that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983," *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011), and that this Court is not free to depart from that precedent, *see Hildenbrandt*, 378 F. Supp. 2d at 48. Plaintiffs contend, however, that this rule is flatly contrary to the Supreme Court's precedent. The Supreme Court has squarely held that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). What is more, it has held this *in a case brought under Section 1983. Warth v. Seldin*, 422 U.S. 490, 493, 511, 515 (1975). The Second Circuit's outlier approach to associational standing directly contradicts this binding Supreme Court precedent and should be repudiated at the earliest opportunity, by a court with authority to correct it.

## CONCLUSION

For the foregoing reasons, *Kachalsky* should be overruled by a court competent to do so.

Dated:  May 7, 2018

David H. Thompson*
Peter A. Patterson*
John D. Ohlendorf*
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
dthompson@cooperkirk.com

   *Appearing *pro hac vice*

Respectfully submitted,

s/ *Kathleen McCaffrey Baynes*
Kathleen McCaffrey Baynes
Bar Roll No. 507154
KATHLEEN MCCAFFREY BAYNES, ESQ., PLLC
   *Attorney of Record*
21 Everett Road Extension, Suite A-4
Albany, NY 12205
(518) 489-1098
(518) 489-3304 (fax)
kmb@kmbaynes.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2018, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause a copy of the document to be served electronically on all parties or their counsel.

s/ *Kathleen McCaffrey Baynes*

Kathleen McCaffrey Baynes

*Attorney for Plaintiffs*